## MARIE L. BADILLO et al. *v.* FRANCISCO TIO.

Proof of the paternal descent of natural children may be made in the following ways: 1st. By all kinds of private writings in which the father may have acknowledged the bastard as his child, or may have called it so. 2d. When the mother of the child was living in a state of concubinage with the father, and resided as such in his house at the time the child was conceived. 3d. When the father, either in public or in private, has acknowledged it as his child, or has habitually called it so in conversation, or has caused it to be educated as such. C. C. 227.

Where the alleged father of a natural child did not sign the registry of baptism in which he is named as the father, and was not apprized of the existence of the act, it can have no effect against him or his legal representatives. Nor does a recital in a register of baptism, signed by the residuary legatee, stating that the testator was the grand-father of the child of the alleged natural daughter, prove the paternity of the daughter even against the residuary legatee.

The fact of interposition may be proved by simple presumptions; but there must be several, all leading to the same conclusion; and in order to make proof they must be material, precise and concurrent.

*Fidei commissa* are not reducible to the disposable portion. They are absolutely null, and the property covered by them returns to the heirs at law. Those who lend their names to carry out *fidei commissa* are viewed as spoliators, and are bound to restore the property intrusted to them for such a purpose to the heirs at law, with the fruits and revenues from the time it came into their possession, and are not exempted from this obligation under the pretence that they were bound to execute the will until its nullity was judicially pronounced.

APPEAL from the Third District Court of New Orleans, *Kennedy*, J. P. E. Bonford, *H. R. Dennis* and *J. A. Rozier* for plaintiffs. *Janin, Taylor* and *F. Grima*, for defendant. The judgment of the court was pronounced by

ROST, J. The defendant is the residuary legatee of the late *Augustin Macarty*, and in possession of his estate as such. The plaintiffs, who are the heirs at law of *Macarty*, sue for the nullity of the will, and claim the property of the testator, with the fruits it has produced and damages, on the ground that

17

the defendant is a mere intermediary, interposed for the benefit of the following persons : *CélestePerrault*, the concubine of the testator ; *Patrice Macarty*, her natural son by the testator ; *Joséphine Macarty*, the natural daughter of the testator, by *Victoria Wiltz*, his first concubine, and herself the concubine of the defendant; and finally, the natural children of the defendant and *Joséphine*. *Phelonise Macarty* is also named as another person to whose benefit the interposition was to inure : but as her incapacity has not been shown she may be left out of view.

The defence is a general denial, and an averment that the defendant is not a person interposed but a *bonâ fide* legatee. There was judgment against the defendant for the property of the succession in his possession, for the value of the portion which had been alienated, according to the appraisement in the inventory, and for the fruits it should all have produced since he took possession of it as executor. The defendant has appealed.

We agree with Judge Preston that the evidence offered to prove the filiation of *Joséphine* and *Patrice* was admissible; and that the decisions upon which he relies contain a correct exposition of the law on the point made : but so far as *Joséphine* is concerned, we cannot agree with him that the evidence in the record proves her paternal descent. Art. 227, C. C., provides that proof of paternal descent may be made in either of the following ways : 1st. By all kinds of private writings, in which the father may have acknowledged the bastard as his child, or may have called him so. 2d. When the mother of the child was known as living in a state of concubinage with the father, and resided as such in his house at the time the child was conceived. 3d. When the father, either in public or in private, has acknowledged him as his child, or has called him so in conversation, or has caused him to be educated as such.

There are no private writings in this case showing that the testator has acknowledged *Joséphine* as his child, and no evidence of an express verbal acknowledgment, either public or private, of the fact that he caused her to be educated as his child. The plaintiffs' witnesses prove, that *Victoria Wiltz*, the mother of *Joséphine*, did not reside in his house when the latter was conceived, and it is shown that she was reared in the house of *Marcos Tio*, and as his child. The only fact to ascertain is, then, whether *Macarty* has given *Joséphine* the name of his natural child in conversation, or more correctly, according to the French text of the code, *dans ses discours*. The only witness who testifies to this fact is the witness *Brigitte*. who represents herself as being also a natural child of *Macarty* by another mother. She testifies that *Macarty* always treated her and *Joséphine* as his daughters, and called them by that name ; that he called *Joséphine's* children his grand-children, and they called him their grandfather. This witness from her condition is not entitled to full credit, and her credibility is further impaired by other statements she has made. In her direct examination, she stated that *Macarty* used sometimes to visit his natural daughters, that he made visits at *Joséphine's*, and that he visited there *en passant*. When pressed, on the cross examination, she stated, that her knowledge of that fact was derived from *Joséphine*. But the plaintiffs subsequently admitted of record that the statement was untrue. This testimony, conflicting as it does with other much more entitled to credit, brings no conviction to our minds.

*Macarty* had the pride as well as the *faibles* of an hidalgo. *Courcelle*, one of his most intimate friends and his habitual companion, says, that he never heard him acknowledge the children of his mistresses, and that he always denied having any. He states, that on one occasion an individual told *Macarty* in his

presence, that he was his son-in-law; to which *Macarty* replied, You my son-in-law: I have no children. The witness subsequently told *Macarty* that the mulatress with whom this man lived claimed to be his daughter; to which he replied, I don't know her. Had he visited his natural daughters, as *Brigitte* states, he would surely have known them and been informed of their domestic arrangements. *Mr. Bacas,* another witness, who has lived in the intimacy of *Macarty* since 1803, and who knew him before that time, says, that he had in succession several mistresses who had children whom he refused to recognize. The testimony of these witnesses is corroborated by the fact that in his correspondence with *Patrice,* who is proved to be his natural son, he does not once acknowledge his paternity, and invariably addresses him as *mon ami.* That correspondence is full of affection; and although he knew and felt that he was *Patrice's* father, he never could bring himself to speak or to write that humiliating truth.

The plaintiffs have produced an extract from the register of baptisms of free persons of color. It shows that *Joséphine* was baptised under the name of *Maria,* and contains a statement that her father was a *Mr. Macarty.* Admitting that *Augustin Macarty* was the person meant, as he did not sign the act, and it is not shown that he was apprized of its existence, it can have no effect against him or his legal representatives.

The plaintiffs have resorted to another kind of proof, which appears to have had great influence with the district judge. In the certificate of baptism of one of the children of the defendant by *Joséphine,* bearing date in 1825, it is stated that his aternal mgrand-father is *Augustin Macarty.* This act of baptism was signed by the defendant; and the plaintiffs contend that it makes proof against him of the alleged paternity. Such an act could not affect *Macarty* if he were living. *Joséphine* could not maintain an action upon it for alimony; and it is not perceived how it can affect the defendant, who is *primá facie* the legal representative of *Macarty.*

The defendant signed the act as father of the baptised child, and it is thus far conclusive against him. But we are not prepared to say that it is equally conclusive of all the other statements it contains. We agree with his counsel, that a person signing such a paper could only be affected by it in one of two ways: because the recital was an extra judicial confession of a particular fact, or because it imported the renunciation of a right in his own favor, or the acknowledgment of one against himself in favor of another, and that the defendant cannot be presumed to have confessed a fact which he could not know, or to have renounced rights or acknowledged claims not then in existence. It is to be observed, that in the registry of baptism of his other children it is stated that their maternal grand-father is unknown. If the testimony of *Brigitte* was credible, it would not establish the fact of paternity; it does not prove that *Macarty* called *Joséphine* his child, in his habitual conversations with others, as we understand the expression *dans ses discours* to require; the name if given at all was given privately, and the habitual companions of *Macarty* never heard it.

*Macarty* ceased all intercourse with *Victoria Wiltz* at about the time of *Joséphine's* birth; and we are satisfied he had not the conviction that *Joséphine* was his child, and that he never acknowledged her as such. He must, at the same time, have thought it probable that she was; and this probability will have some bearing on another part of the case. It is proved that *Céleste Perrault* was the concubine of *Macarty* from 1799 to his death; and that she lived as such in his house when her son *Patrice* was born. Under art. 227, already referred to, we are

bound to consider *Patrice* as his natural son : and the question to which we will now direct our attention is, whether the defendant is a person interposed for the benefit of *Céleste Perrault* and her son. In order fully to understand the merits of this branch of the case, it is necessary to ascend to the origin of the laws concerning the social relations which have given rise to this controversy.

It is a matter of history, that under the Roman Empire marriage fell gradually into disuse. Whether this was owing, on the part of the men, to looseness of morals, or, as some historians intimate, to their unwillingness to submit to the domestic tyranny which the matrons of the Sabinian race were wont to exercise over their husbands, the fact is undeniable ; and neither the fines imposed upon bachelors, nor the giving the seat of honor to married men in all public places, and exempting them to a great extent from the exactions of the *fisc*, had any effect in arresting the progress of the evil. It is stated, that the emperor on one occasion called all the bachelors in the city to his presence, ordered them to mend their ways, and threatened them with the consequences of his displeasure if they did not. But although their fear of the emperor was great, their fear of matrimony prevailed, and despotic power had finally to yield to their obstinacy. As marriage fell into disuse, what was called in Rome unequal marriages superseded it and rose in importance, and it may be said in dignity. Unequal marriages were conventions by which a woman of inferior condition gave herself or was given by her relatives in presence of witnesses to a single man, to live with him in a state of concubinage. This was a serious contract, intended to be permanent, and the forms of which were established by law. The woman who entered into it did not lose *caste;* she retained the good opinion of her friends and relatives, and her children had capacity to inherit her estate and a portion of that of their father, either by will or *ab intestato.* This is no doubt the origin of the morganic marriage as it now exists in some portions of Germany. The laws providing that a man could have but one concubine, and giving to his natural children the right to inherit from their father, were enacted by Justinian. L. 3. Dig. de concubin. L. 16, § 1. Dig. de ritu nuptiarum, L. 3. Codic. de natural. Liberis, Novel. ch. 18, § 5. si autem.

It is probable, that these unequal marriages were of common occurrence in Spain, while that country formed part of the Roman Empire ; as we find that the laws of Rome applicable to them were all reënacted by Alonzo the Wise, and form the subject of the 14th title of the fourth Partida. The rule under the Roman and Spanish laws, as stated by Gregorio Lopez, was *quilibet non ordinatus nec conjugatus potest concubinam habere.* By an express law of the Partidas, the governors of the provinces were forbidden to marry, and authorized to have concubines. Partidas, *loco citato.*

Such was the law of Louisiana after it came under the dominion of Spain, and as there were at that time in the colony but few women of the white race, and hardly any of equal condition with the officers of Government and of the troops stationed here, the inevitable consequence was that these gentlemen formed connections with women of color. This custom, coming as it did from the ruling class, soon spread throughout the colony, and was persevered in long after there ceased to be any excuse for its continuance. It was to remedy this state of things that the framers of the Code of 1808 first created the incapacities of which the plaintiffs claim the benefit.

*Macarty* was a nobleman and an officer in the Spanish army. At the age of seventeen he dwelt with one of his uncles, also a Spanish officer, who lived with a woman of color. *Augustin* soon followed his example, and had in suc-

cession several *liaisons* with women of that class, until in 1799, he took *Céleste Perrault*, with whom he lived nearly fifty years, and until death parted them. She lived in his house, and her conduct was such as to enable her to retain his regard and affection to the last. *Patrice* was the issue of this connection; and the correspondence between him and his father clearly shows, that he and his mother were to *Marcarty* all that a legitimate wife and son could have been. In the latter part of his life he had no other society but that of *Céleste*, and no occupation save that of purchasing and sending goods and produce to *Patrice*, who kept a shop in Pensacola. His letters to his relations show that he was completely estranged from them, and disclose a strong desire on his part to convince them that he was poor and that they had nothing to expect from him. About the time these letters were written to relatives residing out of the State, he made his will, by which, after making some inconsiderable legacies, he appointed the defendant his universal legatee. The defendant is not shown to have had any social or business relations with him. Their position in life, education and habits of thought were too dissimilar to induce the belief that much sympathy could exist between them; and we can discover no apparent motive for making the bequest, except that the defendant lived with a woman whom *Macarty* had some reason to believe was his daughter, and that he was besides the confidential friend and agent of *Céleste Perrault*. We have come to the conclusion, that nothing prevented him from making a donation to *Josephine*. But he was not, probably, aware of this, and may have been induced to select the defendant as the instrument to be used for the transmission of his property in *fraudem legis*. It is not to be believed that *Macarty* failed to provide for *Céleste Perrault*, who, with her son, engrossed all his affections ; or that if the dispositions of the will had been intended to be real, he would not have given her all that the law authorized her to receive. According to the ideas and manners of his time, *Céleste* was, in his eyes, what a kind and dutiful wife would be in ours ; and his omission to provide for her is unaccountable, on any principle of human action. These circumstances raise a violent presumption, that the defendant was not the real object of the testator's bounty.

The fact of interposition involving a question of fraud, there is no doubt that it may be proved by simple presumptions. But there must be several presumptions leading to the same conclusion; and, in order to make proof, they must all be *graves, précises et concordantes.* C. C. 1842, 2267.

The presumptions to which we have referred would not be sufficient to prove the interposition alleged. But if they are corroborated by the acts and conduct of the defendant after the death of *Macarty*, no reasonable doubt of his interposition can exist.

It is in evidence, that the defendant suffered *Céleste Perrault* to retain possession of a portion of the property long after she ceased to have a right to retain it under the will; that she contracted in relation to it as if it had been hers ; and that the slaves on the Carrollton property were sold by her orders and according to directions given by her. These facts, taken in connection with her sudden increase of wealth after the death of *Macarty*, by which she was enabled to travel in Europe during eighteen months, raise almost an irresistible presumption, that the proceeds of the property sold were paid over to her. But even these, taken in connection with the other presumptions, would perhaps be still insufficient. When, however, it is further shown that the defendant has conveyed to her five of the slaves which he received from *Macarty*, there is no room left for doubt. When interposition is made probable, if the party alleging

BADILLO
*v.*
TIO.

it shows the return of the property to the incapable person, he has nothing else to show. When the return has been made under the form of a sale, the legatee must prove the reality and good faith of the transfer: and as this proof has not been made in this case, we are forced to conclude that the slaves were returned to *Céleste Perrault* in execution of the *fidei commissum*. Chardon, De la Fraude, p. 56, 58.

We agree with the district judge, that the effect of that proof necessarily is to give a controlling force to the numerous other presumptions in the case which tend to the same conclusion, and, by its union with them, to destroy all confidence in the entire bequest to the defendant. Had he stated in his answer the portion of the estate which he felt himself bound to return, the question might arise whether, under the evidence, the disposition in his favor would be valid for the remainder. But as he has not enabled us to discriminate, we are bound to believe that it was not in his power to do so, and that no portion of the property was to be retained by him.

It is urged, that the price of these slaves is less than *Macarty* might have given to *Céleste Perrault*. This is true; but *fidei commissa* are not reducible to the disposable portion ; they are absolutely null, and the property covered by them returns to the heirs at law.

We concur, however, in opinion with the district judge, that the legacies to *Patrice* and to *Céleste Perrault* must stand until annulled contradictorily with them ; and we are not prepared to say, that the declaration of *Macarty*, that the furniture in his house belonged to *Céleste Perrault*, may not be considered as a legacy.

The fact of interposition being proved, the defendant must necessarily be considered in bad faith ; but his bad faith only commenced at the time he was 'put in possession as the universal legatee under the will. It is no justification for him to say, that he was bound by his oath to maintain and execute the will until the nullity of it was pronounced at the suit of the heirs. The testator could not give him authority to commit a fraud ; and the oath that he took, that he would consummate it, can surely be of no avail to him. Those who lend their names to *fidei commissa*, says Domat, are viewed, in all cases, as spoliators; and so far from being bound to return the property placed in their hands to the incapable legatee, they contract no other obligation than to restore it to the heirs at law, with the fruits and interests accrued, even before demand. Domat, b. 5, tit. 3, no. 6. (l. 49 Dig. de hæredit. petit,) *Schneider* v. *Ebert et al.* Dalloz, Jurisprudence, 1830, part 1, p. 224.

It is said, that the disposition to *Tio* cannot be distinguished in principle from a donation made directly to the incapable parties. But we think there is no analogy between the two cases. It is the very fact, that instead of making the disposition openly in favor of the real legatees, indirection and concealment were resorted to, which constitutes the fraud to which the defendant has made himself a party.

It is further urged, that the disposition was not fraudulent, because it would have been valid if the heirs had suffered the defendant to remain in possession during five years before bringing this suit. The vice resulting from fraud may, in all cases, be cured by lapse of time, under our laws. But the fraud exists nevertheless, until the expiration of the time required for prescription.

The defendant must restore to the plaintiffs all the real property and slaves forming part of the succession of *Augustin Macarty*, now in his possession ; he

must account to them, as executor, up to the 24th of April, 1846, when he was finally put in possession as testamentary heir. In doing so, the payments made by him, and approved by the court, will be held *primâ facie* to be correct, and he will be entitled to charge commissions, the counsel fees paid by him as executor, and all other expenses incurred during his administration.

From the 24th of April, 1846, the defendant must account for the rents of the real estate, deducting therefrom the taxes and premiums of insurance paid, the cost of repairs and all other useful expenses incurred on account of the said real estate. He must further account for the hire of the slaves *Liza* and *Jackson*, which have remained in his possession, making proper deductions for taxes, clothing, time lost, medical and other expenses. That portion of the case involving the settlement of these accounts must be remanded for further proceedings.

The plaintiffs have asked, that the defendant be adjudged to pay the amount of the appraisement in the inventory of the slaves which are no longer in his possession. He must be so charged in relation to *Henriette* and her children. The other five slaves sold by him were appraised at $2850, and only brought at public auction, two years afterwards, $1715. It is not pretended that the sale was not real, or that a higher price could have been obtained for them. Under those circumstances, the defendant is not bound to account for more than he received. Legal interest must be allowed on these sums from the date of the respective sales.

It is therefore ordered, that the judgment in this case be reversed. It is further ordered, that the plaintiffs recover from the defendant the sum of $1715, with legal interest from the 28th April, 1846, till paid; the further sum of $1500, with legal interest from the 26th April, 1846, till paid; and also the slaves *Jackson* and *Liza*.

It is further ordered, that the plaintiffs recover from the defendant the following landed property, to wit: A certain lot of ground situated in this city, in the square comprised between Conti, Levee, Chartres and St. Louis streets, and measuring sixty-two feet front on Conti street, of which forty-one feet on the side adjoining the property of *Mr. Dufilho*, towards Levee street, have a depth of eighty feet, and the remaining twenty-one feet, adjoining *Mr. Longpré*, on the side nearest Chartres street, have a depth of one hundred feet; with the three story brick stores, with granite fronts, built thereon, and all other improvements thereon. Also, a certain portion of ground situated in the Second Municipality of this city, in the square comprised between St. Joseph, Delord, Camp and St. Charles streets, and the Tivoli square, and measuring in American measure one hundred and fifty feet one inch front on Camp street, two hundred and fourteen feet eight inches and two lines front on St. Joseph street, eighty-seven feet four inches and five lines on a line perpendicular to St. Joseph street and parallel to St. Charles street, one hundred and six feet ten inches on a line separating said portion of ground from the property heinafter described, on a line parallel to Camp street, and one hundred and twenty-seven feet ten inches and five lines on the line parallel to St. Joseph street, and perpendicular to said Camp street. Said portion of ground being composed of lots numbers one, two and three, and part of lot number twelve, on the original plan of the faubourg Delord, drawn by *Lafon*, on the eighteenth day of July, eighteen hundred and seven, and deposited in the office of *William Christy*, notary, in this city; together with the frame dwelling house and other wood buildings thereon. Also, another lot of ground situated in the same square and faubourg, and measuring, in American measure, sixty-two feet four inches and five lines front

on Tivoli circle, by a depth of one hundred and thirty-eight feet on one side line, and one hundred and thirty-one feet six inches on the other side line, and one hundred and six feet ten inches in width in the rear. Also, a square of ground situated in the city of Lafayette, designated by the number twenty-four, on the original plan of the faubourg Lafayette, deposited in the office of the late *Carlisle Pollock*, notary, New Orleans : said square having, in French measure, three hundred feet front on Magazine street, two hundred and ninety-six feet five inches front on Poplar street, and bounded on the fourth side by the lower line of suburb Livaudais, with a dwelling house and other buildings thereon. Also, nine squares of ground in the town of Carrollton, and designated on a plan drawn by *Charles F. Zimpel*, deputy city surveyor, and deposited in the office then of *Felix Grima*, notary public, as squares numbers one hundred and fifty-five, one hundred and fifty-six, one hundred and fifty-seven, one hundred and fifty-eight, one hundred and seventy-two, one hundred and seventy-three, one hundred and seventy-four, one hundred and seventy-five, and one hundred and seventy-six.

It is further ordered, that for all other matters not finally adjudicated upon the case be remanded, with directions to the district judge to cause the defendant to render an account of his administration as executor of *Augustin Macarty*, and for further proceedings in conformity with the views expressed in the opinion of the court. And it is further ordered, that the costs of this appeal be paid by the plaintiffs and appellees.

EUSTIS, C. J., and SLIDELL, J., concurring. We concur in the legal results presented in the opinion and decree prepared by Judge Rost.

PRESTON, J., dissenting. In this case, I have come to the same conclusion upon the main question with the majority of the court, but by means so different, that I deem it my duty to deliver a separate opinion upon the question of the restoration of fruits and revenues. It is with great diffidence I dissent from the opinion of the court on account of the particular circumstances of this case, but am happy that, in the result to the parties, my conclusion does not differ materially from the judgment of the court.

*Augustin Macarty* departed this life in the city of New Orleans, in the month of October, 1844, leaving an estate appraised at $58,610. He left an olographic will, dated the 20th of May, 1842, which was duly probated on the 18th of October, 1844.

He declared himself to be without forced heirs, and instituted *Francisco Tio* his universal legatee, and appointed him his testamentary executor, giving him the seizin of his estate.

He gave freedom to three of his slaves, being minors under age ; appointed *Celeste Perrault* their tutrix, and bound them to serve her until they attained the age by law to be emancipated, when they should be emancipated at her expense, if worthy of emancipation; if not, they should belong to his instituted heir *Francisco Tio*.

He gave to *Patrice Macarty* his clothes and the furniture of his bed-chamber. He declared that the rest of the furniture and movables in his house belonged to *Celeste Perrault*, to whom he gave for six months after his death the use of the property on which he resided. He gave to the boys' asylum of Lafayette, the Catholic Association of Orphans in New Orleans, the Asylum for Orphans in Prytania street; the Perfect Union Lodge, No. 1, and several of his god-children, legacies in money to the amount of $500 each.

*Tio* took possession of the estate as executor; made a correct inventory, so far as appears; executed the will, and rendered his account, which was approved and homologated by judgment on the 2d December, 1845. The debts and legacies were paid; and on the 24th of April, 1846, he was, by a decree of the probate court, discharged from all further trust and liability as executor, and put into possession, as universal legatee, of all the remaining property belonging to the succession of the testator.

On the 16th of December, 1847, the plaintiffs instituted the present suit as the legal heirs of *Augustin Macarty*, and have fully established that they are his sole legal heirs.

They claim from *Francisco Tio* the whole succession of *Augustin Macarty*, on the ground that he was made universal legatee by the will as a person interposed for the purpose of transmitting his succession to persons incapable of receiving or holding the same, to the defeasance of the plaintiffs, and against the laws and policy of the State.

They allege that the persons incapable of receiving, for whose benefit the defendant is interposed, are: 1. *Josephine Macarty*, a free woman of color, who they allege to be the natural daughter of *Augustin Macarty*, with whom *F. Tio* has lived in concubinage for many years, and with whom he has contracted a religious marriage. 2. The natural children of *Josephine*, the issue of her concubinage with *Francisco Tio*. 3. *Patrice Macarty*, the natural child of *Augustin Macarty* by *Celeste Perrault*, a free woman of color. And 4. *Celeste Perrault*, with whom they allege that he lived in concubinage forty years, and until his death, and also of *Philonise Macarty*, another natural colored daughter of *Macarty*.

They allege, that the universal legacy in favor of *F. Tio* is null and void, on account of his interposition, and the incapacity of these persons for whose benefit he holds the property to take the universal legacy, or inherit any part of his estate.

They further allege, that the acknowledgement in the will, that the furniture in his house, and in the possession of which he died, belonged to *Celeste Perrault*, is null as a disguised donation to a person incapable of receiving, as well as the donation to her, for a series of years, of the services of the three slaves to be emancipated when they have acquired the age required by law.

They allege, that the defendant had deprived them of the enjoyment of their property since the 20th of February, 1845, when they demanded it, and had thereby caused them damage to the amount of forty thousand dollars. They pray that they may be put into possession of all the property belonging to the succession, and all the rents and profits of the same; and that *Francisco Tio* may be condemned to pay them forty thousand dollars damages, and for general relief.

The defendant denied that he was an interposed person, and alleged, that he was the actual and *bonâ fide* universal legatee of *Augustin Macarty*; and claimed that he should be protected in the property bequeathed to him by his testator.

The suit is based upon the articles in our Civil Code which prohibit natural fathers, having collateral relations, from leaving to their acknowledged illegitimate children more than the third of their estate; (article 1473;) which prohibit any proof of acknowledgment except an authentic act in favor of colored children, (article 221,) and which impliedly prohibit them from proving their paternal descent from a white father. Art. 226. And as to *Francisco Tio*, immediately

18

they claim to annul the universal bequest to him under article 1478, in the following words : " Every disposition in favor of a person incapable of receiving, shall be null, whether it be disguised under the form of an onerous contract, or be made under the name of persons interposed. The father and mother, the children and descendants, and the husband and wife of the incapable person shall be reputed persons interposed."

On the trial of the cause, the plaintiffs offered verbal and other testimony to prove that *Josephine Macarty*, a colored woman, was the natural daughter of *Augustin Macarty*, and that *Patrice Macarty* was his colored natural son, and that the children of *Josephine* were the natural children of *Francisco Tio*. The testimony was opposed, because our code declares " that illegitimate children may be allowed to prove their paternal descent, provided they be free and white. Free illegitimate children of color may also be allowed to prove their paternal descent from a father of color only." Art. 226.

As illegitimate colored children not legally acknowledged, are not allowed to prove their paternal descent from a white man; it is most strenuously argued that such evidence cannot be given at all to establish paternal filiation. The objection is, that as no proof of paternal descent, but acknowledgement, is admissible in favor of colored children, no other proof should be admitted against them. On the contrary, the terms of the law excluding other proof in their favor, seems to imply that the other proof may be received against them. And nothing is more common in practice than the admission of evidence against a party, which he cannot offer in his favor. The oath of a party may be offered against him, but cannot be received in his favor. His declarations are evidence against but not for him.

But, I am aware that the objection is not so much to the mode of proving the illegitimacy of unacknowledged colored children, as it is to proving the fact of their illegitimacy at all. On this subject it would be sufficient to say, that the Supreme Court, in two cases similar to the present. that of *Jung et al* v. *Doriocourt et al.* 4 L. R. 177, and that of *Robinett et al.* v. *Verdun's Vendee*, 14 L. R. 144, have expressly decided that the illegitimacy of unacknowledged colored children may be proved against them, and their parentage traced to a white father. The tenacity with which the contrary is still insisted, in a long and certainly able argument of the defendant's counsel, grows out of the favorable opinions of commentators, and some decisions of the French tribunals, in what is supposed analogous cases. But it is to be considered, that there exists in our State a public policy, perhaps an absolute necessity, to discourage the amalgamation of the white and colored race, which did not exist in France. Here, marriage between the two races is forbidden by law ; the honor of marriage shall not be debased by the connection. Moreover, the inestimable advantages of marriage to society, shall not be disregarded by encouraging illicit and debasing concubinage with the colored race. But if colored children might make proof of their paternal descent from a white father, they might receive by testamentary dispositions, portions of the father's estate, and without a will, claim alimony from his legal heirs, thus giving direct encouragement to the degrading evils which the exclusion of the proof by law was intended to remedy. The law permits it only where the parent has been so lost to shame as to make an authentic act of his degradation ; and without this absolute certainty, will not allow the shameful investigation in court for the purpose of enabling the colored child, contrary to our fixed policy, to diminish the father's estate to the prejudice of his white and lawful heirs. Such are the reasons for excluding the testimony in favor of colored children.

But the incapacity of the unacknowledged and illegitimate colored child to receive by will, inures to the benefit of the heir of the testator. Code, art. 1696. The law declares the incapacity, and gives the benefit to the legal heir. Now, in declaring the one and giving the other, did the Legislature intend to defeat both and the whole object of the legislation, by prohibiting proof of the fact upon which the incapacity, the benefit, and whole object of the legislation depended. It is far more reasonable to conclude that the law, in declaring the incapacity, and in according to the heir its consequential benefit, intended to allow in his favor all the evidence necessary to enjoy it. And indeed, there is no law excluding the evidence offered, or prohibiting the proof on behalf of the heir of the fact to be established.

The prohibition to colored children to make proof of white paternal descent, was intended, so far as relates to the heir, to prevent them from claiming even alimony; and yet, the construction given to the prohibition by the defendant, would enable the unacknowledged illegitimate colored child to take by testament the whole estate of the white natural father; and the Legislature, instead of discouraging concubinage and amalgamation with the colored race, are supposed to have encouraged it by enabling the natural parent to disinherit his collateral heirs, and give his whole estate to his illegitimate colored offspring. This construction of the prohibitory law must be erroneous; and the proof of the illegitimacy of *Macarty's* children and grand-children was properly received. In making the proof, the law does not limit the heirs to the particular modes of proof prescribed to illegitimate children, in proving their paternal descent by art. 227 of the Civil Code.

The testimony fully satisfies me that *Josephine Macarty* is the natural daughter of the deceased *Augustin Macarty*, and that the children of *Francisco Tio* by her, are his natural grand-children.

*Sanite Rivére* knew *Macarty* well, because she lived with, and had a child by him herself. She proves that he lived previously with *Victoria Wiltz*, a free woman of color, in Dauphine street, and that *Josephine Macarty* was their child. She says *Macarty* was then an ensign in the Spanish troops. On the 3d of February, 1792, the same *Josephine* was baptized by the name of *Maria*, as the natural daughter of *Mr. Macarty*, an ensign in the regiment established in this city, and of *Victoria*, a free woman of color. *Juan Macarty*, an uncle of the child, and cadet in the same regiment, and *Maria Chauvin*, her aunt, were her godfather and god-mother.

*Bridgette Macarty* testifies, that *Josephine*, living with the defendant, *Tio*, is her eldest sister, and the daughter of the testator; that he always treated her as his child, called her so, and she called him father, and that her children were received at his house as grand-children, and called his grand-children, and that they called him grand-father.

A document absolutely conclusive against the defendant on this subject, is the baptism of his son, *Pablo Tio*, in the year 1825. On that solemn occasion, the defendant signed the instrument, in which it was declared, that the infant was his natural son, by *Josephine Macarty*, and that his maternal grand parents were *Augustin Macarty* and *Victoria Wiltz*, a free woman of color.

There is other evidence in the record; but enough has been detailed to establish fully that *Josephine Macarty* is the natural daughter of the testator.

That she has lived with the defendant since 1807, is acknowledged by him, and also that six children are the living issue of their connexion; also, that they

have lived and still live together as a family ; that the children have been reared and educated as such ; and that a priest has performed the religious ceremony of marriage between him and *Josephine :* so that every relation growing out of marriage, in point of fact, existed between them, except its civil effects as to the future, and a manifest intention matured for more than forty years, to supply these by their volition.

Now, our code, art. 1478, declares, that " Every disposition in favor of a person incapable of receiving shall be null, whether it be disguised under the form of an onerous contract, or be made under the name of persons interposed. The father and mother, the children and descendants, and the husband and wife of the incapable person shall be reputed persons interposed."

*Francisco Tio* and *Josephine Macarty* are not husband and wife in law ; and, therefore, the law creating a legal presumption of interposition does not in terms apply to them. But every consideration and motive for the adoption of the principle of law exists equally as to them, with the lawful husband and wife, the same physical connection ; the same affection growing out of mutual dependance and daily reciprocity of domestic services ; the same objects of intense interest for all their mental and physical exertions. They are bound together by a numerous family of children, as dear to them, no doubt, and as constantly the objects of their joint solicitude, hopes and prayers, as if they were their lawful offspring. When, therefore, every consideration for the legal presumption of interposition exists, when it exists in point of fact, shall the parties escape its heavy consequences by no other means than the violation of the laws and the order and decency of society. Shall concubinage with an illegitimate colored woman, so degrading to society, be rewarded by all the beneficence to her which a parent could bestow on his lawful issue, while the white natural child who enters into the honored bonds of matrimony with one of his own race, under a similar bequest, could receive nothing from the wealth of the author of his existence. In the rough language of Lord Coke, " this would be the cursed interpretation that corrodes the text." I conclude, therefore, by the presumption arising from facts supported by every reason creating a presumption of law, that in the universal legacy of *Macarty* in favor of *Francisco Tio*, the latter was a person interposed for the transmission of his estate to his natural daughter *Josephine Macarty.* I look in vain through the record for any, the most remote, motive on behalf of *Macarty* to institute *Tio* his universal legatee, except that he lived in concubinage with his natural daughter, and was the father of his numerous grand-children.

And, having ascertained by the evidence, that the children of *Josephine* by *Tio* are the grand-children of *Macarty*, *Tio* is presumed in law to be a person interposed as to them by the very words of the code, which extends the presumption of interposition to the father of the persons incapable of receiving. His children are incapable of receiving from their natural grand-father, *Macarty*, by donation or inheritance ; for we are bound by the definition of children in article 3522 of the code, that under the name of children are comprehended grand-children, great-grand-children, and all other descendants in the direct line Therefore, articles 913 and 1473 render the children of an unacknowledged natural child incapable of receiving by donation or inheritance from their grand-father. As *Macarty* had every possible motive to dispose of his estate in favor of his grand-children, and none to give it to *Tio*, except that he was the father of his grand-children by his illegitimate daughter, the presumption of law exists that their father was interposed for the benefit of the grand-children.

If the presumption of law did not exist, I would presume in fact that *Tio* was interposed on account of *Macarty's* grand-children, because the reasons are as strong as those applicable to *Tio* and his daughter. But it is not necessary to dwell on this part of the case, as it is not essential, although it affords a double motive to annul the universal legacy in favor of the defendant.

I am unable to yield to the argument of defendant's counsel, tending to prove that natural children not acknowledged, may receive by donation more than those who are acknowledged, because the former are not mentioned in the prohibitory law. This construction of the law would put it into the power, and leave it at the will of the natural parent to defeat the whole object, and all the provisions of our laws on the subject. I have no doubt the term natural children, used in articles 1470 and 1473 of the code, and referred to in article 1478, and as used generally in the code, embraces those illegitimate children who are not acknowledged as well as those who are acknowledged. And with respect to the articles in question, it was so expressly decided by our late Supreme Court in the case of *Robinett et al.* v. *Verdun's Vendees*, 4 L. R. 542—in which decision I fully concur.

It cannot be denied that a different course of decision has prevailed in France, but it has been strongly condemned by able commentators in that country as defeating the whole object of the laws imposing incapacities on natural children. At all events, there are overpowering reasons in our State for rejecting the foreign decisions and adhering to that of our own Supreme Court.

As to *Josephine Macarty* and her children, the law and the facts of the case being adverse to the defendant, the next consideration is the judgment that should be rendered against him in favor of the plaintiffs.

The child and grand-children, for whose benefit the universal legacy in controversy was made, being incapable of receiving the benefit, there is no doubt that the estate, after paying the debts and undisputed legacies, must be restored to the legal heirs. But the restoration of fruits and revenues, and the condemnation to damages for its detention, in my opinion, must depend on the good or bad faith of the defendant. There are general rules as to the consequences of bad faith, but its existence depends upon the particular circumstances of each case. Cases may occur of substitution and interposition, where all the fruits and revenues should be restored, perhaps with interest and damages inflicted. They are generally cases where the facts are unknown and concealed by the parties, where the donor, and apparent, and also real donee, have secret agreements to defraud the lawful heirs, and are ready to maintain their frauds by perjury. To these and like cases the authorities and arguments of the plaintiff's counsel apply. It is our duty to consider the present case alone.

Our law does not prohibit the father from disposing in favor of his unacknowledged natural child, but by implication renders the child incapable of receiving, if the testator have relations. It then declares that the disposition in favor of a person incapable of receiving shall be null, whether made directly or through a person interposed. This is not an absolute, but relative nullity, to be declared when persons interested claim that the nullity should be pronounced. Then the incapacity of the illegitimate child inures to the benefit of the heir. But this nullity cannot be claimed by a stranger or person who has no interest in the result. For if there be no relations, the disposition in favor of even an unacknowledged illegitimate child would be valid, because no law expressly or impliedly prohibits it. Although the incapacity to receive was imposed by law on the illegitimate child with a view to the public good, yet no penalty is affixed

to the bequest to him, and it could not be annulled on the application of the pub= lic prosecutor.   Moreover, if the bequest is not attacked by a legal heir within five years, it becomes valid by prescription, and no longer open to an action to annul it by any body.   Code, 3507.

It was, therefore, the business of *Macarty's* heirs, from the day his succes= sion was opened, to protect themselves by suit or otherwise, and to cause the universal legacy in controversy to be annulled on account of the incapacity of his natural children and the interposition of *Tio*.   As every fact which now exists was then patent, they have only to reproach themselves for not having done so. Until that was done, the sworn executor was bound to execute the will and admit the truth of its declarations; and the court was bound to carry all its pro= visions into effect as far as possible, and to annul them only when clearly proved, at the suit of those interested, that it was authorized so to do by law.   Under this view of the will, *Francisco Tio* having faithfully administered the estate as executor, caused himself to be put into possession of the same as universal legatee, by judgment of the court on the 24th of April, 1846 ; no suit having been brought to annul the will.

Let us then enquire, whether in doing so he acted in good faith, or was, in the language of the Roman law, a spoliator.   To solve this question, it will be useful to enquire what *Macarty* did; what his natural children might do; and what *Tio* has done.

*Macarty*, by his youthful imprudence, had brought into existence an illegiti= mate daughter, and she had become the mother of a numerous offspring in the same situation.   When age and infirmity indicated to him the approaching ter= mination of his life, he deemed it his duty to repair, as far as possible, the mis= fortune he had brought upon his innocent offspring, and bequeathed them the greater part of his estate.   He made some amends to society by other bequests to benevolent institutions.   His immorality consisted in being the author of the existence of his offspring, not in the dispositions of his will.   These were dic= tated by nature and the deepest affections of the heart—which all acknowledge and cherish—the love of a father for his offspring, however unfortunate.   The affection of the testator was perhaps more intense, because he had entailed their misfortune upon them.   We cannot, therefore, denounce the intentions of *Macarty*, but have rather to regret that his folly consisted, like that of most misers, in not doing the good he intended in death during his life, by removing his offspring and fortune to other countries, where they might enjoy it, without the stigma he had imprinted upon them.   It is sufficient to conclude that he neither committed an offence or quasi-offence, or fraud, in making his will and not dying intestate.   He disposed of his fortune as his heart and judgment dic= tated, every fact being then patent, which has been proved in this case, to enable his heirs to annul the disposition if they thought proper.   As already stated, they failed to sue for three years, which has led to the whole difficulty on this part of the case.

Neither did the daughter and grand-children of *Macarty* commit an offence, quasi-offence, or become accessary to a fraud.   Their parent gave them by will an estate.   The will was duly probated and was valid until attacked by those interested to annul its provisions.   We have a right to avail ourselves of the beneficence of any one, at least until those interested take measures to deprive us of that beneficence.   Had the legacy been made directly to the natural daugh= ter and grand-children of *Macarty*, they would have had a title to the property voidable at the suit of the heirs, but a title which time might perfect, and not,

therefore, intrinsically vicious or defective. For this reason, they would have enjoyed the fruits and revenues of the property bequeathed as possessors in good faith by a just title, until suit was brought to annul the legacy.

The case cannot be distinguished in principle from a suit brought for the reduction of an excessive donation to the disposable portion. Now, suppose *Josephine* had been duly acknowledged by *Macarty* to be be his natural daughter, and that he had given her his whole estate, the legacy might have been reduced to one-third of the estate, but only at the suit of his collateral relations. Until they claimed the reduction, *Josephine* and her children would have enjoyed the fruits and revenues of the whole, as possessors in good faith with a just title.

The only duty incumbent on the natural children of *Macarty* was to restore the property to his legal heirs, when they, by suit, annulled the provisions of the will in their favor, and to oppose no obstacles to the successful prosecution of the suit. Their ancestor had imposed on the legal heirs the necessity of a suit to regulate the effect of the will by making bequests manifestly valid, and others which might be annulled. That was the misfortune of the heirs who were obliged to take the estate with the obstacles their deceased relative had interposed, and incur the trouble and expense of removing them.

The daughter and grand-children of *Macarty* were, therefore, in good faith until the suit was brought by the heirs, and it does not appear have opposed any obstacles to the success of the suit.

As to *Tio*, *Macarty* imposed upon him the duty of executing his will, by making it and appointing him testamentary executor. He gave him the possession of the estate, and the right to hold it until the heirs claimed it, and caused the universal legacy to be annulled. He was bound to see it executed, if possible, and the universal legacy maintained, if he could, even after he was discharged as executor and recognized as universal legatee. Code 1665. In the case of *Sterlin* v. *Gros, Executor, &c.*, the Supreme Court allowed the executor the costs and counsel fees paid out of the estate, for endeavoring to maintain a will clearly invalid, because it was the act of the testator, and the duty of the executor to maintain the validity of the will. Even in the case of an undoubted substitution, or *fidei commissum*, where there is no concealment or fraud on the part of the donor or apparent donee, the latter is not necessarily liable for fruits and revenues or to the payment of damages. I give to a faithful friend my estate to keep for a dissipated relative ; the revenues to be expended for his benefit ; the estate to be turned over to him at the death of the donee. It is done openly, and all the facts and motives known to my legal heirs, but in the hope they would not interfere. They do not during the life of the trustee. He faithfully expends the revenues according to my will. The substitution is attacked and annulled at his death. Is his estate liable for the expended revenues ? It is impossible.

There was not strictly a substitution or *fidei commissum* in this case, to which the principles invoked from the Roman and French jurisprudence seem particularly to apply. We have no reason to believe that *Macarty* intended or bound *Tio* by any promise, written or verbal, to preserve the property, and return it or even its value to *Josêphine* and her children. There is great reason to believe that he intended to confer the benefits on his descendants, by making *Tio* the real owner of the property ; because knowing him to be an industrious, economical and prudent man, attached to his concubine and children, as much as if married to the one and the lawful father of the others, he would be likely to employ the property more to their real advantage than they would themselves.

It is the spirit rather than the letter of article 1478 of the Code which requires that the universal legacy in favor of *Tio* should be annulled. For he was in fact the universal legatee of *Macarty;* and his interposition was not so much to hold the estate for his daughter and grand-children as to enrich *Tio,* that they might be benefitted through him. If the bequest had not been attacked by the heirs, and *Tio* had died without in some way securing it to his concubine and her children, the property would have been inherited by his legal heirs. Or he might have abandoned *Joséphine* and her children, and have given it to whom he pleased. All that can be said of *Tio* is, that he has yielded to the intentions of *Macarty,* without attempting secretly to defraud any person. He did not solicit *Macarty* to make the bequest. It does not appear in evidence that he had any secret agreement or understanding with him as to the bequest. The contrary is rather established by the fact that *Macarty* had no intercourse with him, nor he with *Macarty.* He only went to see him the day he died—two years after the date of the will. He was placed in his present position by the relative from whom the plaintiffs claim, and did no act which was not directed by the testator and which the heirs might not have prevented by a timely suit. He concealed nothing from them which they have proved in this suit. Every circumstance connected with his position was as palpable and well known to them the day the will was opened as it is at present. In a word, *Tio* committed no offence or quasi-offence, nor was guilty of any fraud. He was not, therefore, the spoliator of the Roman and French jurisprudence. The whole loss to the plaintiffs has been caused, not by his acts, but by the acts of the relative from whom they claim, and which therefore they must bear, and by their own *laches,* for which they must suffer.

I think, therefore, that nothing can be recovered from *Tio* which could not be recovered from *Joséphine* and her children. In fact, the suit is against them, through him. Having shown that fruits and revenues could not be recovered from them until suit was brought to annul the legacy, they cannot be recovered from *Tio.* They were all in good faith in possession of the property bequeathed to them by the will of the testator as their title, sanctioned by the judgment and authority of the proper court, until the 16th of December, 1847, when suit was brought by the legal heirs to annul the legacy in their favor. To conclude that they were not possessors in good faith, we should be obliged to hold that it was their duty to abandon the property, although *Macarty's* will in their favor was in full force, sanctioned by a judgment of court, and no one had appeared in court seeking to annul it—where alone it could be annulled. The law did not require them to do so, and they are accountable for the fruits and revenues only from the judicial demand.

There is neither presumption of law nor any sufficient evidence to satisfy me that *Tio* is an interposed person as to *Céleste Perrault* or as to *Patrice Macarty.* Indeed, without facts to establish such an interposition we might ordinarily presume, that a white person occupying in fact the position of son-in-law of *Macarty* would have such a repugnance to the colored concubine of his father-in-law in fact, and her offspring, as would remove the supposition that he was an interposed person as to them.

It is true *Mrs. Penn, Mrs. Michel* and *Cobarras,* speak of very indefinite conversations with *Céleste Perrault,* in which she spoke of some claim of herself or son to the small farm in the swamp in the rear of Carrollton; and of her receiving, shortly after *Macarty's* death, very trifling supplies of wood, grass and milk from it, as before that event. But as to *Tio,* the striking facts exist,

that he took possession of, and rented the place, which was of very little value; that he keeps it still, and has sold the negroes; and that even as to the dwelling in which *Céleste* had lived with *Macarty* almost a lifetime, she quit it very soon after the period to which she was limited in the will.

If the testimony satisfied me that *Tio* was interposed as to her, I would agree fully with the majority of the court, that he would be liable to the heirs for the fruits and revenues of the property for which he was so interposed, and, perhaps, to damages; because it could not have been intrusted to him for her, without a secret agreement and understanding with *Macarty* and also with his concubine, as to the amount and disposition of the property for which he was so intrusted.

But to my mind, it is far more likely that *Macarty* provided for her out of his ample resources by pecuniary means, and so secretly as to elude detection, or so effectually that it could not be reached. This means grew out of the recluse life they led for many years; and that they were of a pecuniary character, was indicated by her journey all over the south of Europe shortly after his death.

The last deposit he made in bank was of $3800, more than two years before his death; and of that he afterwards drew out $1500. What became of his ample revenues for more than two years afterwards, and perhaps money accumulating in the possession of his concubine during their long seclusion from society of any kind in their old age?

That his son was engaged in business before *Macarty's* death, and was affectionately aided by *Macarty*, shows that he was provided for without the interposition of *Tio*.

The direct donation of the father to his son, of his clothes, and furniture of his bed room, and legacies to *Céleste Perrault*, cannot be annulled without making them parties; nor can the acknowledgment in the will, that the remaining furniture belonged to her, be disproved except contradictorily with her. The admission of the defendant on record, that it was not hers, is not binding upon her, nor can it have any effect in this suit; for the defendant is not an interposed person as to it. And, as executor or universal legatee, he was bound in law to regard the declaration in the will as true.

For all the foregoing considerations I think the judgment of the district court should be reversed. But, in considering what judgment, in my opinion, should be rendered, it is necessary to premise, that the executor has rendered his account; and I do not feel the necessity of his rendering another account, or protracting the litigation for that purpose. The money, stocks and personal estate which came into his hands amounted to about the sums paid in debts, legacies and expenses, and should be balanced, especially as the executor charged neither commissions nor fees of counsel in liquidating the estate. Six of the slaves sold by *Tio* produced $1715; for which sum alone he is accountable, as he sold them fairly at public auction; and there is no reason to believe with the intention of dilapidating the estate. The slave *Henriette* and her children were sold to *Céleste Perrault* at private sale but for their value, $1500, as appraised in the inventory; and there is no evidence that they were worth more. These sums, with interest from the judicial demand, being the 16th of December, 1847, the plaintiffs should recover. Also, the slaves *Jackson* and *Liza*, and $20 a month for their hire from the same period. Also, the real property described in the inventory, and its revenues from the 16th of December, 1847; deducting its expenses.

BADILLO
*v.*
TIO.

To ascertain exactly the net revenue, and for no other purpose, the cause, in my opinion, should be remanded.

The plaintiffs should pay the costs of the appeal, and the defendant those of the district court. ·