No. 12,674.

SUCCESSION OF WILLIAM L. SHAFFER; OPPOSITIONS OF THOMAS J. SHAFFER, THOMAS J. SHAFFER, TUTOR, MISS SUSIE SHAFFER, AND MRS. ABBIE CROSS, INDIVIDUALLY AND AS TUTRIX OF HER DAUGHTER, CARRIE CROSS.

|  |  |
|---|---|
| 50 | 601 |
| f122 | 544 |

A judgment or order probating a will can be attacked on the final homologation of an account, all parties in interest and the issues involved being before the court.

The writings on two sides of a broken envelope did not form a continuous connected will. On one side is a written list of claims, which list is not signed or dated; on the other, the words: "These notes go to my wife," without designating the notes intended. Not sufficiently certain to give it effect.

The legacy of notes does not lapse when the only purpose, in accepting new notes instead of the old, was to make them more secure as to their payment, and they were substantially the same as the canceled notes.

A legacy from a designated fund is not extinguished if the fund is replenished and is a continuous existing fund.

Particular legacies may speak with reference to the future, if it be evident that the testator expected amounts given to be deducted from sums to be realized in the future.

A legacy in one will is not revoked by a subseqent will in which the testator substantially disclaims any intention to revoke.

A clause in a will giving the usufruct to one person and the ownership to another, at the death of the usufructuary, is not a prohibited substitution. There was no trust created and no property taken out of commerce.

Words of recommendation to a legatee is not a bequest, and is not an illegal condition.

ON REHEARING.

When the testamentary disposition in favor of two or more legatees to be paid from the fund specified deemed by the testator to pay all legatees, but which, when he dies, proves insufficient, the rule of proportional distribution between the legatees will not apply when the terms of the disposition plainly manifest the testator's intention that his wife, named first, shall be paid by preference from the fund.  Civil Code, Arts. 1712, 1635.

APPEAL from the Eighteenth Judicial District Court for the Parish of Terrebonne.  *Caillouet, J.*

*L. F. Suthon* for Executors and Mrs. Shaffer, individually, Appellants.

*D. Caffery & Son* for T. J. Shaffer, Opponent, Appellant.

*Howell & Martin* for Mrs. Carrie Cross, individually and as Tutrix of her minor child, Carrie, Opponent.

Argued and submitted January 25, 1898.
Opinion handed down February 21, 1898.
Rehearing granted April 4, 1898.
Submitted on rehearing on briefs, April 25, 1898.
Opinion handed down May 16, 1898.

The opinion of the court was delivered by

BREAUX, J. This litigation grew out of the application of the executors of the last will and testament of the late William L. Shaffer for the approval of their account showing the assets of the estate; the debts and the dispositions of the various legacies as proposed to be paid by the petitioners.

The deceased left no forced heirs, and there existed no community between him and his wife.

He left three wills, olographic in form.  They are dated respectively, February 10, 1894; March 7, 1894, and May 4, 1895.

In the first will he disposed of the greater portion of his estate, and therein makes known that he has a remainder in cash and notes, which he bequeathed to his wife and other legatees.

In the second will he bequeathed to his wife the cash in bank and

disposed of certain mortgage notes, and declared that he did not intend to revoke the first will. The paper probated as a will subsequent to the two first was written on an envelope, sealed, which was torn at the end.

On the one side, the sealed side, the following was written:

"These notes all goes to Mrs. William L. Shaffer in case of my death," followed by the words "May, the 4–95," and the signature of the late Mr. Shaffer.

On the other side of the envelope are written the names of several makers of notes due, or the name of the plantations on which the

notes bore mortgage; opposite each name the amount of the indebtedness was placed.

All these documents were probated.

The opponents agree in contending that the document of May 4, 1895, which was probated as a will was an absolute nullity for the reason that the words written on the envelope do not form a will; that it lacked the essentials of a will. That they do not designate the notes the testator had in view to give by will; that the words as above stated referred to notes formerly in the envelope and not to the list of notes written on the reverse side of the envelope; that they are not identified with the asserted testamentary disposition. While the opponents are in accord in asserting that this paper was a mere *memoranda*, and not a will, they plead other grounds.

Thomas S. Shaffer, who was a brother of the deceased and one of his legal heirs, specially opposed the proposed distribution of four notes, which he alleged had not been bequeathed to Mrs. W. L. Shaffer and should not be given to her as proposed in the account; that the notes originally bequeathed had been paid before the death of the testator and those it was proposed to deliver were not the notes bequeathed. He opposed the delivery of a note designated as the note of Belle Brooks, and opposed the claim made by the widow to one-half of the proceeds of the crop of 1895. He also opposed a legacy to her of eight thousand dollars, for the reason that the funds from which he had directed it to be taken had been expended, and that the fund from which it was proposed to pay the amount could not be drawn upon for the payment of that amount. He also opposed the claim made by Mrs. W. L. Shaffer as a legatee of a half interest in the crop of 1895, and others named as legatees of one-sixth interest of that crop, for the reason that the crop for the year 1895 could not have been bequeathed in a will written in 1894.

Mrs. Abbie Cross, individually and as tutrix, was also an opponent, alleging that the estate is solvent, and she, in consequence, is entitled to the whole amount bequeathed to her.

Miss Susie Shaffer is another opponent. She sets forth that the clause of the will in which she is interested has been ignored and she claims its interpretation.

There were other oppositions and supplemental opposition filed to which we will refer later.

The executors moved to strike out from the oppositions all issues

arising from the alleged invalidity of the wills on the ground that these wills, after they had been probated, could not be collaterally attacked.

The court overruled the motion, and ordered the legatees to be made parties. When the oppositions were heard all parties in interest were before the court.

The court a qua rendered judgment, reformed the tableau of distribution in conformity with the views expressed in its opinion, and, as amended, ordered the distribution to be made.

From the judgment opponents appealed and here complain of the interpretation placed upon the valid wills.

The executors, also, have appealed; they complain of the judgment annulling the last will probated—i. e., the will of May 4, 1895.

The first question for our determination arose on the motion of counsel for the executors to strike out issues indicated by him. The grounds were: the wills having been regularly probated, they can not be attacked as null by way of opposition to an account presented for homologation; that the opponents had a direct action to annul, if the will was null.

Of what use: was the question which suggested itself when the point was stated in argument.

A subsequent examination of the authorities has not led us to conclude that our first impression was erroneous. The issues had been regularly formed by the appearance of all the opposers. All the parties were plaintiff or defendant in so far as they had an interest in the questions involved. The succession will be closed by the final account and the issues on the oppositions as effectively disposed of as if they had been tried and decided in a direct action.

The action here, in a certain sense, is a direct action. Moreover, the proceedings probating the last will probated were ex parte and not such as required a direct action for their annulment, and in addition the will is attacked on the ground that it is an absolute nullity. If it be void, as alleged, the nullity may be here urged, contradictorily with all the parties, not one of whom asserts that a single question could be raised in a direct action that is not at issue in these proceedings. This court said in Rachel, Tutor, vs. Rachel, 1 R. R. 117, that the probate of a will did not have the effect claimed; "that it can not be considered as a judgment binding on the plaintiffs" who were not parties.

The rules relating to the proving of wills were considered in Fuentes vs. Gaines, 25 An. 92, as a preliminary proceeding necessary to the settlement of estates which are not conclusive, citing numerous decisions.

The learned counsel representing the executors asserts that our whole law may be searched in vain to find a case where the validity of a will duly probated was ever attacked by way of opposition to an account; that the uniform practice has been a direct action of nullity with all the parties in interest before the court.

Here we find all the parties in interest before the court, and the action is in nullity. The direct action practically is a matter of mere name of the action.

In our judgment this is a stronger case for hearing the causes of nullity than any of those cited. Succession of Von Hoven, 46 An. 920.

### THE WILL OF MAY 4, 1895.

This paper has the appearance of having been made piecemeal, without connection to indicate with any degree of certainty what was the intention of the testator. Neither writing, that endorsed on the upper part or that written on the sealing side of the envelope, is, in our judgment, a will. The writing on one side of the envelope is not dated, and the writing on the other side does not identify the notes the testator intended to will and bequeath. It is not possible to determine whether the testator intended to bequeath the notes imperfectly listed on the back of the envelope, or the notes placed within the envelope and sealed, if there were, at one time, notes enclosed in the envelope. The theory of the counsel for the executors is that the notes described on the envelope never were in it, and there could not possibly have been anything in the envelope when the writing was made thereon, because the writing could not have been as smooth and clearly written as it was. We were at first inclined to accept that theory; a further examination revealed that the lines drawn lengthwise on the back of the envelope—columns drawn to make the figures—extend the length of the envelope. There are traces left indicating that the lines extended to and over the end torn when the envelope was broken. This being the case the inference is unavoidable that there were notes enclosed in the envelope that were withdrawn from it after it had been sealed and at the time when its end was torn.

It is a matter of uncertainty whether the testator in the signed
memorandum referred to the list on the back of the envelope or
to the notes enclosed. When the envelope was found it had nothing
in it. We give no importance to the fact that the will was written
on an envelope. If the writing were in its entirety dated, written
and signed by the testator, the envelope upon which written would
not, in our view, of itself, give rise to a valid objection. The want
of identification of the thing is the objection fatal, as we think, to
the validity of the writing as a will.

NOTES SECURED BY MORTGAGE ON ELLENDALE.

We are brought to the objection urged by opponents against the
legacy of notes to Mrs. W. L. Shaffer designated as above. They
were secured as to their payment by a mortgage on a plantation
known as Ellendale.

The notes were signed by Miss Nellie McCollam, Alex. McCollam,
William McCollam and Ed. McCollam, as makers. The first named
maker died and her property was inherited by her co-makers of the
notes, who were her brothers. Another of the makers died after his
sister, Miss Nellie, leaving as his heirs minor children. The holder
of the notes: Wm. L. Shaffer, the testator in the wills before us,
desired a new arrangement, and for that reason the property was
offered for sale by public auction—i. e., the mortgage was fore-
closed. The purchaser subsequently, in accordance with an agree-
ment entered into prior to the sale, sold it to Messrs. Alexander and
Ed. McCollam for twenty-three thousand dollars, represented by
four notes of five thousand seven hundred and fifty dollars each,
which were turned over to W. L. Shaffer. They are the notes
claimed by his widow as legatee.

In order to safeguard the interest of the minor heirs of Willie
McCollam, deceased, these purchasers, A. and E. McCollam, exe-
cuted a counter letter. The witnesses who have testified upon the
subject said that the amount of the debt remained the same and the
debtors practically the same.

But the opponents contend that the debtors were different; that
the first McCollam notes foreclosed had nothing whatever in com-
mon with the second (those executed after the foreclosure), save
that they were secured on the same plantation. Unquestionably, if
the plantation after the foreclosure had been sold to third persons,

entire strangers to the transaction, upon notes, their legal *status* would have been different. Here they were in effect the same debtors. The readiness manifested by the creditor, Wm. F. Shaffer, to accept the signatures of two of the makers on notes secured by mortgage, indicates plainly enough that he looked particularly to the mortgage. In our judgment his object was to remove the paper he held from a signature representing minor's interest, and at the same time, against the remaining makers of the notes, secure after foreclosure other notes with mortgage and vendor's privilege.

In enumerating the values given to Mrs. Shaffer he names "the McCollam paper March 1, 1894." It is before us as the McCollam paper, less two signatures, before mentioned. There was no change, save as we have stated. In that which may be considered a change we did not discover that it arose from a wish and intention not to include this claim in the legacies, nor in our view, was such the effect of the new arrangement, even if considered without regard to the intention of the testator as made evident by the facts.

The thing had not perished. There is a destruction of the substance of the thing bequeathed when it has undergone a complete and radical transformation. Thus, the commentators have illustrated the subject by reference to lumber bequeathed which before his (testator's) death was changed into a sailing craft; the substance had perished and the legacy had lapsed; the legatee had no right to the craft. The change of the accessory or collateral form, which modifies the thing without altering its nature—for example, the change of ploughable land into a vineyard, would not cause the legacy to lapse; despite the change the thing retains the same juridical nature. For greater reason it would be the same of changes which would leave to a thing its form and its name. The legacy of a boat would not lapse from the mere fact that it had been repaired so many different times that there would not remain one plank of the original construction; despite the change it is always the same boat. Baudry-Lacantinerie, Vol. 2, p. 447.

The claim still exists against the debtors.

"The legacy falls if the thing bequeathed has totally perished." C. C. 1700.

"The reservation arises from some act which supposes a change of will." C. C. 1691. We would not feel justifiable in assuming that the testator intended to change his will, from the fact that he sought,

as we are led to conclude, new arrangement with the view to greater security for payment of his notes. In the case of Succession of Batchelor, 48 An. 278, we said that "the legacy perishes when it is extinguished by one of the causes which puts an end to the obligation. If a claim be paid it no longer exists, and there is an end to the particular legacy."

Here, in our view, the testator did not put an end to the obligation. Beyond all this, it is made evident by the terms of the will that the testator did not desire to collect this claim at maturity; that he wished it to remain as an investment for his wife, to whom he, in his will, gave direction to collect the interest and renew the notes.

### THE NOTE REFERRED TO AS THE BELL FARM NOTE.

One of the opponents, Mrs. Cross, individually and as tutrix, assails the bequests made to Miss Bocage on the ground that the legacy is a prohibited substitution and *fidei commissum*.

The will as relates to the legacy in question reads: "Now, I hold a note of Miss Bell Brooks for three thousand dollars, first mortgage on Bell Farm. The owners of Bell Farm, so long as it is for Mrs. Brooks and family, will pay you the interest yearly during your lifetime; and at your death the said note will go to my god-child, Miss Bocage." The "you" addressed was his wife.

The proposition is not disputed, that the testator may give the usufruct to one and the naked ownership of the same property to another legatee. From our point of view this was precisely the intention of the testator. He did not leave the note to his wife. He gave her the interest yearly. At her death the ownership will be with Miss Bocage. Such a legacy is allowed by law. A similar question was decided in Succession of Barker, 10 An. 28. In Succession of Law, 31 An. 456, 461, as in the case before us for decision, the testator had bequeathed the usufruct to one legatee, and at his (the legatee's) death the property to vest in another legatee; the court sustained the legacy. From the standpoint of that decision we have not here discovered any trust or prohibited substitution by this legacy to Miss Bocage.

### EIGHT THOUSAND DOLLARS CASH IN GENERAL FUND.

The will bequeathing this amount was dated in 1894. It was the fifth of a fund designated as a general fund reserved from the pro-

ceeds of a crop made for account of joint owners, to carry on the plantation jointly owned by them, the year succeeding.

The following is the clause of the will assailed: " Now I have $8000 (eight thousand dollars) in cash, in the general fund, for running my one-fifth. To this amount I will in full to my wife, to be paid at the end of the year, with one-half of my portion of the net proceeds of the crop," on the ground that the testator confined his bequest to the general fund for 1894. That by " at the end of the year" written in the will a particular year was intended—that is, the year in which the will was written, and that the general fund referred to was spent during the year of the writing of the will; and that the general fund of the succeeding year, which is carried upon the account as a legacy, was new and different, which had also been exhausted and expended at the date of the testator's death.

It is true that this fund was expended each year to make the crop and that the proceeds of the crop would be drawn from in order to replace this amount in the common fund for the next crop. In 1895, in accordance with an agreement of the common owners, the amount was reduced to thirty-two thousand dollars, and the portion of the late Mr. Shaffer in this fund was the amount carried to the credit of his widow in the account, to-wit, six thousand four hundred dollars. This fund during a number of years never went out of existence. It was well known to all those who were familiar with the transactions of the joint owners of the plantation in which the testator had an interest. The illustration of the water-craft, quoted *supra*, we think applies here. It was not the identical cash, but the " fund" known as such. It had not been changed to another substance or to anything else. The *corpus* remained and is susceptible of complete identification by reference to an interest in a well-known " common fund." In the Batchelor succession case, 48 An. 278, the note bequeathed had been collected and canceled and there remained nothing save the cash realized, which was in the possession of Mr. Batchelor, under circumstances, as we thought, denoting his intention not to bequeath amount realized by him in the note.

With reference to this legacy the opponent also contends that the testator confined his bequest to the fund for 1894; that in directing that the fund should be paid " at the end of the year," the particular year, 1894, was intended.

The interpretation usual in the matter of wills preclude our reading

in the will, a particular year, in the absence of words denoting that a particular year was intended.

But it is urged in argument that the testator expected death before the first of the month following; that in apprehension of death he gave instruction to his legatee to extend a note to which he specially refers; which fell due the month following.

This alone is not such an indication of apprehended death as would justify us in concluding that he desired to limit the payment of this legacy out of the fund of 1894. We take it that direction was given by him in case of his death, to extend payment of certain notes. The clause of the will before us does not give rise to the inference that he necessarily meant payment should be made from the fund of a particular year. We do not think we are authorized to add, by construction, the year "1894" to the bequest out of the general fund. Had he been so inclined he could easily have added the particular year. The clause is separate and contains a complete disposition. It can not, in our view, be limited or enlarged in its meaning by reference to another clause directing the extension of payment of certain notes.

In our judgment this legacy is a specified legacy which had not lapsed, and being a particular legacy of an existing fund, it does not conflict with other legacies which disposes of all the cash.

"The legacy of the property I possess in such a place is a particular one." 5 Toullier, 487, 524. The nature of the legacy is not varied because a sum of money is bequeathed. A legacy of one hundred reals which I have in such a box is good for so much as the testator has there." Church vs. Miller, 5 N. S. 102.

Upon this process of reasoning, in our view, it follows a legacy to be charged to a designated fund, which was made up from year to year from the proceeds of a common crop, is effective to the amount remaining of the fund at the date of the testator's death.

### THE CROP.

The account is opposed on the ground that the crop of 1894, the year of the testator's death, was the crop bequeathed and not the crop of 1895, which the executors proposed to distribute. That the testator having willed the proceeds of the crop of a particular year, the proceeds of the crop of the year in which the will was

written was intended. The necessity presents itself at this point of interpreting two clauses of the will, that would be conflicting if opponent's theory be correct; both clauses containing dispositions of crops would relate to the one crop of the year in which the testator made his will. We do not gather from the whole body of the will that the testator could have fallen into the error and absurdity of bequeathing the same property to two different persons in clauses of the will one immediately following other—*i. e.*, grant crop in one clause and revoke it in the next.

In our view the article cited by the opponents in support of their position, part of which reads: " A disposition, the terms of which express no time neither past nor future, refers to the time of making the will " (1722 C. C.), does not apply for the reason that unless the testator was grossly inattentive and guilty of an absurdity, he must have referred to the crop of 1894; by the use of the words "including my portion of the present crop" in one paragraph and to the crop of subsequent year, in the paragraph referring as we take it to the proceeds of a subsequent crop.

Though he may have been indifferent in the written use of words he evinces anxiety to dispose of all of his property and nothing in his will creates the impression that he was wanting in the care and concern that the prudent owner usually bestows upon his own. Moreover the expressions of the will manifest a strong desire to amply provide for his widow, to whom he gave the bulk of his fortune. It is not at all probable that he intended, particularly as to her, to give her property in one breath and take it away in the next. A clause of a will should be, we think, interpreted if possible so as it will have effect. C. C. 1713.

Terms used by the testator "must be taken in the sense in which it is believed he understood them." 6 Toullier, No. 312.

### LEGACY TO A NIECE, MISS SHAFFER.

The conditions following this legacy are somewhat confusing and unintelligible. The name of the testator's wife is first mentioned as the intended legatee, but immediately after the testator directs that, if living at the date of his death, Miss Katty Shaffer shall, instead of the wife, receive the legacy. The language of the will is as follows: " Now I have one note of T. S. Shaffer for two thousand dollars, first mortgage on one-fifth interest in Crescent Farm. I also will this

note to my wife, with the understanding that if Katy Shaffer is living that she will get both the principal and interest." If it was the intention of the testator to establish, in regard to this legacy, an order of succession, as presumably it was, Mrs. Shaffer is not the first in the order of succession, but Miss Kate Shaffer. The latter was the one designated to receive the principal and interest from the succession, which carried with it the note bequeathed. The words used carry with it the meaning that Miss Shaffer, if living, was to receive the note, and not Mrs. Shaffer.

DISTRIBUTION OF A FUND STATED IN THE FIRST WILL.

The clause opposed reads:

" Now, I have, in cash and other notes, which will amount to fully (including my portion of the present crop) fully $20 to $25,000 twenty-five thousand dollars.

" Now, I will to my wife out of this, fifteen thousand dollars in cash, or its equal. I will *then* will to Mrs. Abbie Cross and her daughter the sum of five thousand dollars.

"*Now the balance* I want my wife to take and have it so divided among T. S. Shaffer's children." (Italics ours.)

The grounds of opposition are that the amount of a cash legacy under a second will should be deducted from the legacy as above written covered by the first will. In taking up this question for discussion and determination, we in the first place, find:

In the will of March 7, which is the second or last valid will, the testator gave it as his intention not to " invalidate " the first will. We did not discover that the intention by the use of the word just quoted was only to guard against any possibility of canceling or destroying the anterior will as a whole, but that it was expressive of the intention to give specially an amount of cash which he had in bank without abrogating or making null any of the legacies in the will of an anterior date. He expressly directed that this cash should be paid to his wife, and added that his will did not " invalidate " his previous will, but gave her possession of the cash on hand. We believe it was his intention to add this legacy of cash in bank to the legacies previously made. This item of cash he evidently intended should go to her, and it was, we think, properly placed to her credit. But it appears that the amount remaining is not large enough to pay the two legacies (under another clause of fifteen thousand dollars to

Mrs. Shaffer and five thousand dollars to Mrs. Cross and her daughter).  The question (because of the insufficiency of the designated fund) before us at this point is whether this legacy to the wife should be paid in full, or whether the amount should be divided *pro rata* between these two legacies; the wife and Mrs. Cross, under Art. 1635 directing that a proportionate division be made of particular legacies among the legatees of " sums of money unless the testator has *expressly declared* that such a legacy shall be paid in preference." (Italics ours.)

The meaning of the word " then," as used by the testator, must determine his intention.

No one having some appreciation of the value of property will deliberately use a word in disposing of it different from its meaning in a literal sense as he understands it.

Because of the predisposition in serious matters to employ the proper words we traced " then " to its original, and, as we judge, proper meaning.  The word has more meanings than one.  We sought to make the different meanings clear by the following:

*Tunc* expresses the meaning " time," at the time, *ibi; eodem tempore.*  Says Ainsworth in his dictionary:  It may also express time subsequent: after that; *unde; postea; deinde.*

It has also another meaning without application here.  The corresponding French word is *alors* and *ensuite*, observing about the same difference in meaning as in Latin.  We here made use of the foregoing definition for the reason it is concise and is the basis of the modern definition of the word " then."  In the Century Dictionary the definition is the same as just stated.  If the word be taken in its ordinary or popular signification the same difference in meaning arises.  To illustrate:  To A is given fifteen thousand dollars; then to B five thousand dollars, out of one fund.  The fund not being enough for both, should be *pro rated*.  In any point of view there is obscurity as to whether it was intended to make the legacy separate and independent or joint in case the particular amount was not large enough to pay both.  The article of the Code offers a solution; the testator must make his intention known in this respect, or the fund constituting the particular legacy will be proportionately divided.

We have italicised the words " now the balance." in the third clause, clearly indicating, indeed substantially declaring, that the legacies just preceding in the clause of the will should be first paid.

### NOTES DATED AFTER THE WILL.

The argument of the opponents as to these notes is grounded upon Art. 1722, C. C., and brings up a question upon which we have already passed when considering other legacies which gave rise to a similar objection.

The testator's intent to bequeath with reference to the future, and not with reference to the date of the will, is made evident, as we think, by the amount donated in the clause of the will we are now considering.

It required the notes and the cash on hand at his death to make up the amount donated. The testator wills with reference to all notes as we think, needful to make up the total donated. It is true that several of these notes bear a date subsequent to the date of the will, but they are covered in our judgment by words general in term: that the notes, together with the cash, will make up the total bequeathed. The object of the rule of interpretation is to discover the intention of the testator. It was not, in our view, the intent to leave undisposed of the notes for amounts comparatively small. It was his purpose to give all his property. A clause, unless it can not be otherwise interpreted, will not be interpreted so as to change the will of the testator.

### ADVISORY CLAUSE OF THE WILL.

As we appreciate the utterances of the testator contained in his will he recommends to his wife to give to C. B. Morrison ten thousand dollars. It is a matter left to the will of the legatee. It is not a substitution or an illegal condition whereby property is taken out of commerce.

A recommendation, said this court, in Succession of Trouard, 5 An. 390, "to give from time to time some little assistance to a certain person is not a legacy." In our judgment the interest vested exclusively in the legatee and the request made was addressed exclusively to her conscience. The young man was reared by the testator and his wife, who are childless. He was, presumably, in favor with both, and the former trusted to the latter to carry out his request.

This brings the task of reviewing and construing the different clauses of Mr. Shaffer's will to a close and we have found no ground upon which to reverse the judgment.

We have throughout sought the intent of the testator.  It alone, all realize, should govern and have effect.  The questions, at times, were, owing to ambiguous expressions of the testator, involved and obscure.  If, in any respect, the meaning by us has not been seized as intended by the testator, an opportunity remains to press the different view to our attention.

It is therefore ordered, adjudged and decreed that the judgment appealed from is affirmed at appellants' costs.

---

### SEPARATE OPINION.

WATKINS, J.   I concur in the opinion of the majority of the court except with regard to the following provision of the testament of February 10, 1894, viz.:

" Now, I have in cash and other Notes which will amount to fulleye (including my portion of the present crop)  fullye $20,000 to $25,000 twenty-five thousand dollars.  *Now I will to  my wife* oute of this fifteen Thousand dollars cash, or its Equal.

" *I will then will* to Mrs. Abbi Cross and her daughter, the sum of Five Thousand Dollars.  Now, the ballanse I want my wife to take and have it so divided among T. J. Shaffer's children in Such a waye that it will be of some use to them (I meane the Female Parte of the Family).  Now I want my wife to give to C. B. Morrison, oute of that portion which She received the Sum of $10,000—Tenn Thousand Dollar's, Said Sum to be given to him as She thinke's Best, all at One time or so much a year, during his life time.  I think so much a year is best, unless he goes into some payin businèss.''

In my opinion it was the evident purpose of the testator, that his wife should be preferred as a legatee to the extent of fifteen thousand dollars, to be paid her from the fund specified; and hence his disposition is expressed in the *present* tense, thus:  " *Now I will to my wife,*" etc.   And that the one in favor of Mrs. Abbi Cross, was to be *subsequently paid from the residue  thereof,* if any, is evidenced by the words employed in the *future* tense, viz.:  " *I  will then will* Mrs. Abbi Cross,*" etc.

I scarcely think those two dispositions fairly  susceptible of a different  construction without departing from the text of the will.

ON APPLICATION FOR REHEARING.

MILLER, J. In this case the court grants the rehearing on the question whether the twenty thousand dollars, the subject of one of the dispositions of the will, shall to the extent the fund remained at the testator's death, go to his wife, or be distributed between her and Mrs. Abbie Cross, as we directed in our first decree. On this point the court will receive briefs from the parties and decide without oral argument, the briefs to be filed within twenty days. In all other respects the rehearing is refused.

ON APPLICATION FOR REHEARING.

MILLER, J. The rehearing in this case was granted on the question arising on that part of the will of the deceased relating to his supposed fund of twenty thousand or twenty-five thousand dollars, and introducing his wife and Mrs. Cross as legatees.

The disposition, so far as it is material to the controversy, is:

"Now I have in cash and other notes, which will amount to fully (including my portion of the present crop) fully $20 to $25,000 twenty-five thousand dollars. Now, I will to my wife out of this, fifteen thousand dollars in cash or its equal. I will then will to Mrs. Abbie Cross and her daughter the sum of five thousand dollars. Now, the balance I want my wife to take and have it so divided among T. S. Shaffer's children."

In our original opinion we reached the conclusion that the fund the testator supposed he would leave to discharge the legacies proving insufficient, the legatees should share the fund in the proportions of the amounts of their respective legacies. This is the rule of distribution when legacies exceed the funds for their payment and the testator has directed no priority or preference of payment. Civil Code, Art. 1635.

The re-examination of the question has impressed us that the testator did in this disposition intend the priority of payment, which excludes the proportionate distribution when the particular legacies are made with no such priority or preference and the property left is not enough to pay all the legacies. "But if, the Code says, there is preference of payment expressed, there is no proportionate distribution." The priority in this case in favor of the

testator's wife, we think is the necessary implication from his language. He expresses himself: "I will to my wife out of this, fifteen thousand dollars in cash or its equal." Supplying the punctuation "this" refers to the fund he then supposed amounted to twenty thousand or twenty-five thousand dollars. The disposition, we think, in legal effect stands by itself; that is, not modified or dependent upon the dispositions that follow. His wife stood first in his contemplation in the distribution of this fund. "Then" following the disposition in her favor, we think must be deemed to refer to the residue of the fund when the fifteen thousand dollars is paid to his wife. The words "then I will to Mrs. Abbie Cross and her daughter the sum of five thousand dollars" conveys, in our opinion, the plain significance that the Cross legacy was to have no effect until the wife's legacy was paid. The phraseology of the testator with no aids, usually calls for the application of the cardinal rule for the interpretation of legacies; that is, the intention of the testator fulfilled, we think, by supposing the wife is to receive her fifteen thousand dollars first, and defeated, in our view, by giving Mr. Cross a proportionate share to the diminution of the fund and to the prejudice of the wife.

It is therefore ordered, adjudged and decreed that our former judgment, in respect only to these legacies herein referred to, be avoided and set aside, and that the fund for payment of the said legacies be first applied to pay that of fifteen thousand dollars to the wife of the testator, and the residue, if any, to the legacies in favor of Mr. Cross and daughter, and that appellees pay costs.

MR. JUSTICE BREAUX dissents.