122 LOUISIANA REPORTS.

(47 South. 884.)

No. 17,133.

In re BILLIS' WILL.

(Dec. 14, 1908.)

1. WILLS (§ 96*)—LETTER CONSTITUTING.

A letter written, dated, and signed by the author, may serve as a last will, where it contains testamentary language indicating that it was so intended.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 229; Dec. Dig. § 96.*]

2. PERPETUITIES (§ 4*)—FIDEI COMMISSUM—PRESUMPTIONS.

The law presumes that a testator intends a lawful rather than an unlawful disposition of his property, and though such presumption may be rebutted, and the creation by last will of a fidei commissum may be proved by presumptions arising from circumstances dehors the instrument, such presumptions must be grave, precise, and consistent, and must leave no reasonable basis for a different conclusion.

[Ed. Note.—For other cases, see Perpetuities, Cent. Dig. § 38; Dec. Dig. § 4;* Trusts, Cent. Dig. §§ 3, 4.]

3. PERPETUITIES (§ 4*)—FIDEI COMMISSUM.

Where, in sufficiently explicit terms, the person named as universal legatee is bequeathed the entire estate of the testator, the expressions or instructions, "Now, do as I told you, at the station, when you left," and "Do for my children as I have said" (referring to certain illegitimate children), are too vague and uncertain to impose any charge on the legatee, and do not create a fidei commissum in favor of the children.

[Ed. Note.—For other cases, see Perpetuities, Cent. Dig. § 38; Dec. Dig. § 4;* Trusts, Cent. Dig. §§ 3, 4.]

(Syllabus by the Court.)

Appeal from Thirteenth Judicial District Court, Parish of Grant; Wilbur Fisk Blackman, Judge.

In the matter of the probate of the last will of Joseph Billis. From an order probating the will, the opponents appeal. Affirmed.

Henry Denis, for appellants. W. C. & J. B. Roberts and James Alexander Williams, for appellee Morat.

### Statement of the Case.

MONROE, J. An instrument, written in French, and of which a translation is given below, was offered for probate as the olographic last will of Joseph Billis, and the probate was opposed by W. B. Clark "curator for absent heirs and for Henry Denis, delegate for the French consul to represent absent heirs," on the grounds that the instrument had not been written and signed by Billis, and "that the said last will contains a prohibited substitution and fidei commissum in favor of the illegitimate children of Joseph Billis, by which the universal legatee is charged to transmit the whole or part of the decedent's estate to the said illegitimate children." The instrument (as translated) reads as follows:

"Redemption P. O. (La.), October 27, 1906.

"Dear Nephew Antoine:

"You will excuse me for not answering your letter sooner. I will say to you that I have been to New Orleans since you left school. It was on business, and I returned eight days ago. I am very glad to know of your safe arrival at Memphis, Tennessee, and all the disasters that you have seen. Last Sunday your father and mother told me that you are at a new school that has been opened, and I think that will be a greater advantage to you. Now, do as I told you, at the station, when you left. If anything should happen to me, no matter what ["ci n'importe ayant quelque chose m'arrive"], take possession of that which I have. I give you all that I have accumulated. That is my will ["c'est ma volonté"]. Not a cent ["ci pas le sou"] for my brothers, remembering the ingratitude of which you know. Settle my accounts. Do for my children as I said. I transfer ["passe"] to you all my rights. Take care of this letter. Now, work hard. This will be the last year of work for you. Try to work, to be received. You know what the field is, and you have proved it with courage, and that is what makes me believe in you. As to the examination, you will go out one of the first, and afterwards, you know, if your father cannot afford to do for you what you need, I will. Accept, then, my sincere friendship ["amitiez"]. Your Uncle. And if you need anything, write to me. [Signed] Joseph Billis."

### Opinion.

It is abundantly shown that this instrument is altogether in the handwriting of the decedent, so that the question of its sufficiency, in that respect, may be at once eliminated.

Counsel for opponents submits to this court (for the first time, there being nothing in the pleading on the subject) the proposition

that, in order to establish a letter as a last will, it must appear that the writer so intended it, and he cites Demolombe, Baudry-Lacontinerie, and the Court of Cassation as supporting him. Conceding the soundness of the proposition, and taking the record as it is, we find nothing which suggests any doubt that the decedent intended the instrument here presented to take effect after his death and to operate as a final disposition, so far as he was concerned, of his property. That he did not intend it as a conveyance in præsenti is evident from the qualifying clause with which he begins the use of the dispositive language, to wit, "If anything happens to me, no matter what," or, as we find it in the record, "Any time something happens to me." In other words, the addressee was to take possession of the property and occupy the status accorded to him by the instrument only when, and if, something should happen to the writer, and the evidence offered by the opponents, in his handwriting, taken in connection with the facts subsequently developed, indicates clearly that the "something" which the writer had in contemplation was his own death. Then follow the words:

"Take possession of that which I have. I give you all that I have accumulated. That is my will."

It is true that the writer uses the word "volonté," and the learned counsel suggests that the French word "means simply volition, and not last will and testament." Nevertheless the records of our courts contain many testaments, written in the French language, in which "volonté" and "dernière volonté" are used as the equivalents of "will" and "last will," and the evidence shows that Joseph Billis had lived in this state, and in an English-speaking parish, for many years, so that, considering the context, it seems more than probable that he used the word "volonté" just as an American, similarly situated, would have used the word "will." He then proceeds to state his wish that his brothers should get nothing, and to give his reasons, which would have been altogether uncalled for—as, indeed, the whole instrument would have been—if he had not been making a disposition of his property, to take effect after his death, since, so long as he lived, his estate would have remained under his own control. He then writes:

"Settle my accounts. Do for my children as I said. I transfer [passe] to you all my rights. Take care of this letter."

The addressee, it will be remembered, was in a distant city, and there was no suggestion that he should go at that time to the parish of Grant, either to settle the accounts of the writer, to take possession of his property, to do for his children, or for any other purpose; his succession to the rights and obligations conferred and imposed upon him, and the action that he was expected to take, being dependent and contingent upon the happening of "something" to, or, in other words, the death of, the writer. An eminent English author, dealing with the question presented, says:

"If an instrument is not testamentary, either in form or substance (none of the gifts in it being in testamentary language, or being in terms postponed to the death of the maker), and no collateral evidence is adduced to show that it was intended as a will, probate will not be granted of it as a testamentary document."

He then refers to the case of a person who wrote a paper in these words:

"I, A. B., in the presence of the two undermentioned witnesses, do give all my goods and chattels to M. D., of ——, spinster."

In such case it was held:

"That, as the paper bore upon its face no evidence of its being intended to be testamentary, but it rather appeared, both from its contents and from the evidence dehors (though the latter was rather conflicting), to have been intended as a present gift, probate ought not to be granted."

On the other hand, in a note to the above, we find the following reference to the case

of Morrell v. Dickey, 1 Johns. Ch. (N. Y.) 153, viz.:

"The following letter, addressed to a friend, was held to be good and valid as a will: 'A thousand accidents may occur to me [the writer was about sailing for the West Indies] which might deprive my sisters of that protection which it would be my duty to afford, and in that event I must beg that you will attend to putting them in possession of two-thirds of what I may be worth, appropriating one-third to Miss E. and her child, in any manner that may appear most proper.'" Jarman on Wills (5th Am. Ed.) vol. 1, pp. 45, 46.

We therefore conclude, upon the record as we find it, that the instrument offered for probate in this case was intended as a last will and testament. We will say, further, that if we had entertained any doubt upon the subject we might, perhaps, have found it necessary to remand the case, since we should find some difficulty in ordering the probate of an instrument which upon its face did not appear to be testamentary either in form or substance, and equal difficulty in deciding a case against a litigant upon an issue that had not been raised in the trial court and concerning which he had had no opportunity of offering evidence.

Considering the objection that the will contains "a prohibited substitution and fidei commissum," it is well understood that an essential requisite to a substitution is that the thing given be tied up in the hands of the first recipient during his natural life (Beaulieu v. Ternoir, 5 La. Ann. 480), and counsel for opponents appears to concede that there is no substitution in this case. The fidei commissum is not, perhaps, defined with such precision; but it has been said to differ from the substitution in that (in such case) the charge imposed on the first recipient is to be executed during his life. Succession of Michon, 30 La. Ann. 218. A better founded distinction, perhaps, lies in the fact that in a case of substitution the gravatus, or first recipient, and the ultimate beneficiary, both take title to the thing given di-

rectly from the donor, whilst in the case of the fidei commissum the title vests in the ultimate beneficiary, for whom the first recipient holds and administers the gift as trustee. In the instant case we find that the testator bequeathed his estate absolutely to a particular person, and in legal contemplation imposed no charge upon him whatever. That he had at some previous time verbally expressed a wish or given an instruction with which he expected his instituted heir to comply is apparent from the language of the will:

"Now, do as I told you, at the station, when you left. * * * Do for my children as I said."

So far as the will is concerned, however, such vague references to conversations or understandings between the testator and the legatee amount to nothing more than reminders or appeals by the former to the conscience of the latter.

But by previous understanding between the parties the same thing might have been accomplished by the most trifling mark, scratched on the will, or the turn of a letter, or the dating of the will on a particular day, or the writing of it on a particular kind of paper, either of which devices might have been intelligible to the legatee, but neither of which could be recognized by the courts as part of the testament, being too vague to admit of interpretation. Succession of Trouard, 5 La. Ann. 390; Succession of Shaffer, 50 La. Ann. 601, 23 South. 739; Succession of Bougere, 28 La. Ann. 743.

In a case of this kind we think there can be no doubt that evidence dehors the instrument is admissible for the purpose of ascertaining whether the legatee named is a person interposed and charged to deliver the property to others whom the law declares incapable of taking (or of taking beyond a certain proportion) directly from the testator, since the question involved is one of

public policy and fraudem legis. ' Such evidence was considered, as of course, in the case of Badillo et al. v. Tio, 6 La. Ann. 129. In the case at bar, however, the opponents rely exclusively upon presumptions arising from the following circumstances (as stated in the brief of their counsel), to wit:

"(1) Billis had legally acknowledged his illegitimate children.

"(2) He gave them, during his lifetime, 74 acres of land.

"(3) He was devotedly attached to them, and had his wife promise to receive them at his house.

"(4) He wrote, just before his death, that he was going to kill himself, because she would not permit them to come to his house, and he had been unhappy with her for ten years of marriage.

"(5) He disliked his brothers, and did not want them to inherit one cent from him.

"(6) Morat, the alleged universal legatee, was his cousin, not his nephew.

"(7) The said Morat was a mere youth."

Another circumstance relied on is that, a few months after the date of the will here offered, and the day before his death, Billis attempted to make a will leaving his property to his children (who were colored as well as illegitimate) and his cousin, Morat, in equal proportions. From these circumstances the learned counsel argues that:

"If the letter to Morat did not contain the secret charge to transmit his property to his children, then he left them nothing. Yet all his affections were centered upon them. His ten years of marriage were so much of misery and unhappiness, as he said himself. He had no love for his brothers, and would give them nothing. Morat himself was only a distant cousin of his. It is impossible to believe that he intended to go to his grave and leave absolutely nothing to his children. Only one conclusion is admissible, and that is the fidei commissum."

There is a great deal of force in this argument, all the greater since it must be conceded that proof of fraud is in all cases mainly dependent on presumptions arising from the circumstances, surroundings, and influences naturally operating on the minds of those by whom the fraud is supposed to have been committed. But there is something to be said on the other side. Billis,

122 La.—18

as has been stated, had already given his children 74 acres of land that we know of, and, conceding that he was devotedly attached to them, it may fairly be presumed that he had given them a good deal more, of which we are not informed. He was estranged from his brothers, who live in France (whence he came), and, so far as the record shows, had no relatives in this country, save Morat and Morat's parents. Morat appears to be an intelligent, well-educated young gentleman, who was studying medicine at the date of the letter (and will) here in question, and he testifies that, though he and Billis were cousins (he does not use the word "distant"), the latter always appeared to be attached to him and called him his "nephew." Billis himself was a man of so little education that he could not correctly spell the simplest words in his native language. He had, as he himself says, in one of the papers offered by opponent, so far lost caste in the community in which he lived that he had no friends, and, being estranged from his brothers, it appears to us not improbable that he found in Morat, as his blood relative, and the equal, socially and otherwise, of his neighbors, a person in whom he could feel an honest family pride, and upon whom he could lavish his affections without shame. It may be, therefore, that when he wrote to Morat, "Do for my children as I have said," he was merely reminding him of some previous request or instruction to the effect that he should aid them in the management of their affairs and encourage them in decent living, and the presumption that he could have meant nothing but that Morat was to turn over to them the property which had been left to him is therefore not inevitable. In the somewhat similar case of Badillo et al. v. Tio, supra, a similar presumption was invoked, and the court said:

"These circumstances raise a violent presumption that the defendant was not the real ob-

ject of the testator's bounty. The fact of interposition involving a question of fraud, there is no doubt that it may be proved by simple presumptions. But there must be several presumptions leading to the same conclusion, and, in order to make proof, they must all be 'graves, precises et concordantes.' Civ. Code 1842, art. 2267.

"The presumptions to which we have referred would not be sufficient to prove the interposition alleged. But, if they are corroborated by the acts and conduct of the defendant, after the death of Macarty [the testator], no reasonable doubt of his interposition can exist."

And the opinion then goes on to show that the presumptions were corroborated by the fact that the legatee turned over the property bequeathed to him to the person for whom it was really intended.

Upon the other hand, the doctrine is well established that the proponent, in a case such as this, starts with the presumption in his favor that the testator intended a lawful, rather than an unlawful, thing. Cole's Widow v. His Executor, 7 Mart. (N. S.) 414; Roy v. Latiolas, 5 La. Ann. 557; State v. Executors of McDonogh, 8 La. Ann. 259; Succession of Theurer, 38 La. Ann. 510.

We therefore conclude that the fidei commissum alleged by opponents has not been proved, and the judgment appealed from is accordingly affirmed.