(49 South. 998.)

No. 17,455.

GRANDCHAMPT et al. v. ADMINISTRA-
TOR OF SUCCESSION OF
BILLIS et al.

In re CAMERON.

(June 15, 1909. Rehearing Denied June 30,
1909.)

1. WILLS (§ 302*)—OLOGRAPHIC TESTAMENT—
EXTENT OF PROOF.

An olographic testament must be proved
by the declaration of two credible persons
"that they recognize the testament as being en-
tirely written, dated, and signed in the testa-
tor's handwriting," and such witnesses must
satisfy the judge that they are familiar with
the testator's handwriting and signature. Rev.
Civ. Code, art. 1655, as amended by Acts 1896,
p. 168, No. 119. Depositions as to general
resemblance will not suffice, especially where
the means of knowledge of the witness is very
limited, and the testament is suspicious on its
face.

[Ed. Note.—For other cases, see Wills, Cent.
Dig. § 706; Dec. Dig. § 302.*]

2. DONATIONS—ACTION TO RESCIND—INGRAT-
ITUDE.

Where the donee murdered the donor, and
then committed suicide, an action will not lie
by the heirs of the donor against the heirs of
the donee to revoke or dissolve the donation
for cause of ingratitude. Rev. Civ. Code, art.
1561.

[Ed. Note.—For other cases, see Gifts, Dec.
Dig. § 41.*]

3. HUSBAND AND WIFE (§ 248½*)—COMMU-
NITY PROPERTY.

Where A. donated certain lands to B. prop-
ter nuptias, and, after the marriage, B., the
wife, donated the same property to A., the hus-
band, *held*, that the lands so retroceded did not
fall into the community.

[Ed. Note.—For other cases, see Husband and
Wife, Dec. Dig. § 248½.*]

(Syllabus by the Court.)

Appeal from Thirteenth Judicial District
Court, Parish of Grant; Wilbur Fisk Black-
man, Judge.

Action by Victor Grandchampt against the
administrator of the succession of J. Billis
and others, and application of R. S. Camer-
on for the probate of the last will of Lola
Billis. The actions were consolidated, and,
from the judgment, plaintiffs appeal. Re-
versed, and judgment rendered.

See, also, 121 La. 340, 46 South. 348; 122
La. 539, 47 South. 884.

Joel Lafayette Fletcher and Alexander &
Wilkinson, for appellants. W. C. & J. B.
Roberts and John Alexander Williams, for
appellees.

LAND, J. Joseph Billis, a native of
France, settled in the parish of Grant about
the year 1880, and in the course of time ac-
quired farming and timber lands. He took
unto himself a colored woman as a concubine,
and four or five children were the issue of
this illicit connection. Billis lived openly
with this woman and her children on one of
his farms until some time in April, 1897,
when he sent them away, and made other
provisions for their support. It seems that
about this time Billis made up his mind to
marry a woman of his own color, and paid
court to Miss Mary L. U. Grandchampt. On
May 6, 1897, Billis donated to Miss Grand-
champt 785 acres of land, including his home-
stead, in consideration of their contemplated
marriage, which took place on the same day.
On June 23, 1897, Mrs. Billis donated the
same lands to Billis, her husband, in consid-
eration of her love and affection for him.
The marriage proved barren, and the parties
seemed to have lived together unhappily.
Billis was much attached to his bastard chil-
dren, and wanted them to visit him at his
home. His wife very naturally objected, and
seems to have had her way. The parties con-
tinued to live together with more or less fric-
tion for a number of years. In October, 1906,
Joseph Billis wrote a letter to his cousin,
Antoine Morat, a young man attending a
medical school in Memphis, Tenn., saying, in-
ter alia:

"If something happen to me, take possession
of all that I possess. I give you all that I
have made, it is my desire and will, and not to
my brothers, because *as you know* they have
treated me unjustly. Do for my children as
I told you. I pass to you all my rights. Keep
this letter."

In January, 1907, it appears from a writing signed by Joseph Billis that he was contemplating suicide on account of his wife's bad treatment of him for 10 years. His principal complaints were that his wife married him for his money, refused to permit his children to visit him, and treated him as lower than a negro, refusing to eat with him, etc.

On February 22, 1907, Joseph Billis made a will, null for want of form, in favor of his illegitimate children and Antoine Morat.

On February 26, 1907, the dead body of Mrs. Billis, clothed in a nightgown, was found in the yard of the common dwelling. Death was caused by a pistol shot wound in her back. Evidently Mrs. Billis was shot as she was flying from the house. On breaking into the common sleeping room, the searchers found the dead body of Joseph Billis on the bed. Billis had committed suicide in a most gruesome manner by slashing his own throat, and then shooting himself through the face. He bled to death. The physical facts demonstrated that Billis shot his wife as she fled from the house, and then, locking himself within the room, proceeded to take his own life.

The notary appointed to make an inventory of the property belonging to the succession of Joseph Billis found in the iron safe of the deceased a document reading as follows, viz.:

"Grant Parish State Louisiana.
"May 28th 1897.
"In case of Death I give to my husban Mr. Joseph Billis the full right of all my property I have here after my Death.
"[Signed]  Lola Billis."

The letter written in October, 1906, by Joseph Billis to Antoine Morat was probated as his last will and testament in olographic form, and the decree of probate was affirmed by this court in December, 1908. See In re Billis' Will, 122 La. 539, 47 South. 884.

Soon after the death of Joseph Billis, Victor Grandchampt and other collateral heirs of Mrs. Lola Billis brought suit against the administrator of the succession of Billis and his heirs at law, alleging that Mrs. Lola Billis died intestate, leaving the tract of land which she acquired in 1897 by donation inter vivos from Joseph Billis and her interest in the community which existed between them. Then plaintiffs, anticipating the defenses that might be set up by the defendants in the suit, assailed the retrocession of the same property by Mrs. Billis to her husband as illegal, and also as procured by force, fraud, and threats. Plaintiffs also assailed any will purporting to have been made by Mrs. Billis in favor of Joseph Billis as a forgery, and, if her act, as void for want of form. Plaintiffs finally alleged that Joseph Billis murdered his wife, and was therefore unworthy of taking either under the will or the donation. Plaintiffs' petition was dismissed on exception of no cause of action, and they appealed. In the meantime the document of date May 28, 1897, had been propounded for probate as the last will of Mrs. Lola Billis, and Victor Grandchampt et al. had opposed the probate of the same.

On the appeal this court reversed the judgment, sustaining the exception of no cause of action, and remanded the case for trial with the proceedings involving the probate of the alleged will of Mrs. Lola Billis. This court held that the wife may during marriage return to the husband by donation inter vivos property donated by him propter nuptias, and that the collateral heirs of the deceased wife had no standing to annul or reduce such donation on the ground that it was a donation omnium bonorum. The court, however, held that the heirs had the right to assail such donation on the ground of force, fraud, and threats. See Victor Grandchampt et al. v. Heirs of Joseph Billis et al. (No. 16,868, decided in March, 1908) 121 La. 340, 46 South. 348.

The cases were consolidated and tried be-

low, and Victor Grandchampt et al. have appealed from a decree probating the document of date March 28, 1897, as the last will and testament of Mrs. Lola Billis and rejecting all of their demands.

The first question in the case is whether the decree of probate is supported by the evidence.

Article 1655 of the Revised Civil Code of 1870 reads as follows:

"The olographic testament shall be opened, if it be sealed; and it must be acknowledged and proved by the declaration of two credible persons, who must attest that they recognize the testament as being entirely written, dated and signed in the testator's handwriting, *as having often seen him write and sign during his life time.*" (Italics ours.)

By Act No. 119, p. 168, of 1896, the italicised words were stricken out, and the following sentence substituted:

"The judge shall interrogate the witnesses, under oath, touching their knowledge of the testator's handwriting and signature, and shall satisfy himself that they are familiar therewith, making mention of the whole in his procès verbal thereof."

John L. Calhoun had never seen Mrs. Billis write or sign her name. As a matter of fact, he could not testify that Mrs. Billis could write at all or read writing. Mr. Calhoun kept a country store and was postmaster. Mrs. Billis gave and sent him some written orders for goods, and his knowledge of her handwriting was derived from such orders. Mr. Calhoun, referring to the purported will of Mrs. Billis, said:

"It looks like the same writing to me. I see no difference."

Mrs. J. L. Calhoun's knowledge of Mrs. Billis' writing was derived from the same or similar orders sent to the store of her husband. Mrs. Billis spoke to Mrs. Calhoun about some of these orders, which were filled and charged in the usual course of business. On one occasion Mrs. Calhoun saw Mrs. Billis write an order for certain articles of apparel.

Mrs. Calhoun testifies that the purported will "looked" to be in the handwriting of Mrs. Billis, and that her "b's" and "p's" were noticeable from their resemblance to the handwriting of her husband's father. On cross-examination Mrs. Calhoun said:

"Everything in it is exactly her handwriting, as I answered the question awhile ago. The 'p' and 'b' are the two letters I noticed."

H. B. Farnaldo, an intimate friend of Billis, saw letters written by Miss Lola Grandchampt before her marriage, and received a note from her afterwards, and on one or more occasions saw her write. This witness positively recognized the purported will to be genuine. As already stated, the document was found in the safe of Billis after his death.

Testimony as to handwriting is at best "opinion" evidence, and its value depends on the knowledge of the witness of the handwriting of the person in question. Article 1655. The Code of 1870 required that such knowledge should be derived from "having often seen him (the testator) write and sign during his lifetime." The amendment by Act No. 119, p. 168, of 1896, while eliminating this restriction as to the means of knowledge, still requires the witness to attest that he recognizes the testament as being entirely written, dated, and signed in the testator's handwriting, and also to satisfy the judge that he is familiar with the handwriting and signature of the testator. No one but the witness can know whether he recognizes a certain handwriting as the work of a particular person, and it will not suffice for a witness to testify to mere resemblances. Neither of the Calhouns testified that they recognized the purported will to have been wholly written, dated, and signed in the handwriting of the testatrix, but their statements are confined to the general resemblance between the writing in the will and certain written orders, only one of which is

proven to have been written by the testatrix.

The purported will is before us. It is written in pencil. The figures "28," representing the day of the month, were evidently written with a different pencil, and differ in slope and form, from the figures "1897" in the same line. A number of intelligent witnesses testified that the figures "28" are in a different handwriting from the rest of the instrument. The final letter of the name "Joseph" is written with a loop below the line making the "h" resemble a "y." This mode of writing the letter "h" was a distinctive peculiarity in the signature of Joseph Billis as testified by a number of witnesses. These suspicious circumstances admonish us of the wisdom of requiring strict proof of the confection of testaments. The law requires proof of identity by the testimony of two credible witnesses that they recognize such identity, not only in the body of the instrument, but in the date and signature. Testimony as to mere general resemblance will not suffice.

We are therefore of opinion that the execution of the purported testament of Mrs. Lola Billis has not been sufficiently proven. The depositions of the Calhouns are vague and uncertain, and their means of knowledge very limited. Neither of them identify the date and the signature of the document with any degree of particularity.

We do not think that the evidence sustains the charge that the donation from Mrs. Billis to her husband made in June, 1897, was procured by fraud or duress. The donation was by act passed before a notary and three witnesses, and Mrs. Billis made the declarations contained in the instrument, and signed the same apparently of her own free will and accord. The evidence relied on by plaintiff and opponents consists of vague declarations attributed to Mrs. Billis after the donation had been made, and the exhibition by her in a few instances of apprehension of violence at the hands of her husband. As coming from Billis, the only evidence is a declaration on his part that he had acted the fool in giving his property to his wife, and would never do so again. Of course, the statements of Mrs. Billis subsequent to the donation are not competent evidence against the succession of Joseph Billis, and his statement certainly does not prove that the donation was procured by duress. It is probable that Billis, who was both a farmer and storekeeper, discovered that the donation to his wife had impaired his credit and importance in the community, and therefore importuned his wife to reconvey the property to him. He may have made himself disagreeable to his wife on the subject, and may have used his marital influence to induce her to accede to his wishes. But there is no proof of duress. It is to be remembered that the parties lived together in the same dwelling for more than nine years after the donation was made, and that the wife made no claim whatever to the property which she had conveyed to her husband. That the wife dominated the household is shown by the despairing writings left by Billis, in which he complained of her mistreatment of himself for 10 years and of her persistent refusal to permit his children to visit him at the common dwelling.

The plaintiffs and opponents contend that, even conceding the validity of both the donation and the will, the fact that Joseph Billis murdered his wife furnishes just cause for the dissolution of both dispositions. The argument that the evidence does not show a murder or unlawful killing is without merit. None of the attendant facts and circumstances point even remotely to a case of self-defense, and the evidence before us would justify a hanging verdict by any jury.

"When the prosecution makes out such a case as would sustain a verdict of guilty, and the defendant offers evidence, the burden is on

him to make out the defense, whatever it may be, that he presents." Wharton's Crim. Ev. (9th Ed.) § 331.

A donation inter vivos may be revoked or dissolved on account of "the ingratitude of the donee." Rev. Civ. Code, art. 1559. There are three causes for such revocation:

"(1) If the donee has attempted to take the life of the donor.

"(2) If he has been guilty toward him of cruel treatment, crimes or grievous injuries.

"(3) If he has refused him food when in distress." Rev. Civ. Code, art. 1560.

"An action of revocation for cause of ingratitude must be brought within one year from the day of the act of ingratitude imputed by the donor to the donee, or from the day the act was made known to the donor.

"The revocation cannot be sued for by the donor against the heirs of the donee, nor by the heirs of the donor against the donee, unless, in the latter case, the suit was brought by the donor, or he died within the year the act of ingratitude was committed." Rev. Civ. Code, art. 1561. "The same causes which, according to the foregoing provisions of the present title, authorize an action for the revocation of a donation inter vivos, are sufficient to ground an action of revocation of testamentary dispositions." Rev. Civ. Code, art. 1710.

The text of the law reads, "The revocation cannot be sued for by the donor against the heirs of the donee," and limits the right of the donor or his heirs to sue the donee to one year.

Under the corresponding article of the Code Napoléon (957), it is held by all the French jurists that the death of the donee extinguishes the action because the revocation is a penalty which can be pronounced only against the guilty. Laurent, 13, p. 34, No. 30; 18 Carpentier-Du Saint, Répertoire du Droit Français, p. 639, No. 3185. This rule applies even when the donee dies immediately after the commission of the offense or injury. Ib. No. 3186. The law makes no exception to this rule, and courts can make none.

In intestate successions where the heir has been adjudged "unworthy" because of crimes or offenses against the de cujus (Rev. Civ. Code, art. 966), his children are not excluded by the fault of their father (Rev. Civ. Code, art. 973); and the next of kin is called to the succession in default of the unworthy heir (Rev. Civ. Code, art. 974).

In the philosophy of the law the revocation of donations for cause of ingratitude is considered as personal to the donor, and the restricted provision in favor of the heirs of the donor is not only exceptional, but may be said to be inconsistent with the theory of the law.

It is clear, however, that the law does not visit the sins of the donee on his heirs at law.

A community of property existed between Joseph Billis and Lola Billis, and that community must be settled in the succession of the husband. The interest therein of the heirs of the wife is residuary. We consider the discussion of what particular property belongs to the community as premature. The judge below did not pass on this issue. It is clear that the lands donated propter nuptias were the separate property of Joseph Billis, and that the donation of the same property to him by his wife operated as a renunciation, which effaced the original act of donation, or as a new title by act of donation to him alone. In either case the lands did not become community property.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and it is now ordered that the petition to probate the alleged last will of Mrs. Lola Billis be dismissed with costs; and it is further ordered that the plaintiffs in the proceeding entitled Victor Grandchampt et al. v. Succession of Joseph Billis et al. be recognized as the heirs at law of Mrs. Lola Billis deceased, and, as such, entitled to be put in possession of all the property belonging to her succession, including her interest in the community formerly existing between her and Joseph Billis according to law. It is further ordered that the opposition of said heirs to the pro-

bate of the alleged will of Mrs. Lola Billis of date May 28, 1897, be sustained. It is further ordered that the question of what property belongs to the community which existed between Joseph Billis and Lola Billis be reserved for future adjudication. It is further ordered that all the demands of said plaintiffs Victor Grandchampt et al. not recognized or reserved by this decree be dismissed, and it is finally ordered that the succession of Joseph Billis pay the costs below and costs of appeal.